IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL H. HOLLAND, MICHEAL W.
BUCKNER, B.V. HYLER and STEVEN F.
SCHAAB as Trustees of the UNITED MINE
WORKERS OF AMERICA 1974 PENSION
TRUST,
2121 K Street, NW
Washington, DC 20037

MICHAEL H. HOLLAND, MICHEAL W.
BUCKNER, B.V. HYLER and STEVEN F.
SCHAAB as Trustees of the UNITED MINE
WORKERS OF AMERICA CASH
DEFERRED SAVINGS PLAN OF 1988,
2121 K Street, NW
Washington, DC 20037

MICHAEL H. HOLLAND, MICHEAL W.
BUCKNER, A. FRANK DUNHAM and
ELLIOT A. SEGAL as Trustees of the
UNITED MINE WORKERS OF AMERICA
1993 BENEFIT PLAN,
2121 K Street, NW
Washington, DC 20037

     Plaintiffs,
  v.

DOUBLE-BONUS COAL COMPANY
818 N. Eisenhower Drive
Beckley, WV 25801

     Defendant.

Civil Action No.

## COMPLAINT

1. Plaintiffs Michael H. Holland, Micheal W. Buckner, B.V. Hyler and

Steven F. Schaab are Trustees of the UMWA 1974 Pension Trust. Michael H. Holland,

Micheal W. Buckner, B.V. Hyler and Steven F. Schaab are Trustees of the UMWA Cash

Deferred Savings Plan of 1988. Michael H. Holland, Micheal W. Buckner, A. Frank Dunham and Elliot A. Segal are Trustees of the UMWA 1993 Benefit Plan. The UMWA 1974 Pension Trust, the UMWA Cash Deferred Savings Plan of 1988 and the UMWA 1993 Benefit Plan are collectively referred to hereinafter as the "UMWA Health and Retirement Funds" or "Funds." The Trustees conduct the business of the Funds at 2121 K Street, N.W., Suite 350, Washington, D.C. 20037.

2.      Double-Bonus Coal Company ("Defendant") is a West Virginia corporation with an office and/or address at 818 N. Eisenhower Drive, Beckley, West Virginia.

3.      Jurisdiction is conferred on this Court by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185; Section 502(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(e); and Section 9721 of the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), 26 U.S.C. § 9721.

4.      The UMWA Health and Retirement Funds are employee benefit plans within the meaning of Section 3(3) of ERISA, 29 U.S.C. § 1002(3) and multiemployer plans within the meaning of Section 3(37) of ERISA, 29 U.S.C. §1002(37).

5.      Plaintiffs allege that since June 3, 2004 the Defendant has been engaged in operating a certain coal mine or mines, or coal mining business in and/or about Wyoming County, West Virginia.

6.      On or about June 3, 2004 the Defendant signed the National Bituminous Coal Wage Agreement of 2002 ("Wage Agreement"). A copy of the relevant portions of the Wage Agreement are attached hereto as Exhibit A. Under the terms of Article XX(d) and Article XXB of the Wage Agreement, the Defendant is required to pay into the Funds

2

certain amounts based on each hour worked by the Defendant's classified employees. The Wage Agreement further required the Defendant to make payments by the tenth day of each month covering amounts due based on the preceding month's operations, and to furnish monthly statements showing the full amounts due and payable based on the hours worked. These statements are called Remittance Advice Forms.

7.    The Defendant did not make payments to the Funds based on hours worked as required by the Wage Agreement and thereby caused the Funds to suffer loss of investment income and to incur administrative costs.

8.    Based on an Audit dated October 22, 2007, it has been determined that the Defendant underpaid its contributions due under the Wage Agreement during the period June 3, 2004 through May 28, 2006 for hours worked in the principal amount of $176,137.27. Plaintiffs demanded payment by letters dated October 30, 2007 and December 17, 2007. Defendant has failed to remit payment.

9.    ERISA Section 515, 29 U.S.C. § 1145 provides that:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

The Defendant violated the provisions of Section 515 of ERISA and the Wage Agreement by engaging in the conduct described in paragraphs 7 and 8 above.

WHEREFORE, Plaintiffs demand the following relief:

(a)    a preliminary injunction enjoining the Defendant from violating the terms of the collective bargaining agreement, and enjoining the

3

Defendant from disposing of any assets;

(b)    a permanent injunction upon hearing of this cause, enjoining the Defendant from violating the terms of the collective bargaining agreement and disposing of any assets until the terms of the collective bargaining agreement are complied with;

(c)    Judgment to the Funds in the amount of $176,137.27 based on hours worked during the period June 3, 2004 through May 28, 2006;

(d)    Judgment for all amounts due based on hours worked by Defendant's classified employees from June 3, 2004 to date, and for all amounts that become due based on hours worked during the pendency of this action;

(e)    Judgment for interest on all amounts due based on hours worked, from the dates they became due pursuant to the Wage Agreement;

(f)    Judgment for the greater of double interest on the delinquent amount or liquidated damages of 20 percent pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g);

(g)    Judgment for attorneys fees, audit costs and other costs and disbursements in this action;

(h)     that the Court retain jurisdiction of this case pending compliance

with its orders; and

(i)     for such other and further relief as the Court may deem just.

Respectfully submitted,

DAVID W. ALLEN
General Counsel
DC Bar #81638

LARRY D. NEWSOME
Associate General Counsel
DC Bar #254763

KATHLEEN B. BURNS
Assistant General Counsel
DC Bar #492460
UMWA HEALTH & RETIREMENT FUNDS
Office of the General Counsel
2121 K Street, N.W.
Washington, D.C.  20037
Telephone:  202-521-2233

Attorneys for Plaintiffs

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Michael H. Holland, et al. as Trustees of the United Mine Workers of America 1974 Pension Plan, Cash Deferred Savings Plan of 1988, and 1993 Benefit Plan | DOUBLE-BONUS COAL COMPANY |

| | |
|---|---|
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    88888<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>Larry D. Newsome, Associate General Counsel<br>Kathleen B. Burns, Assistant General Counsel<br>UMWA Health & Retirement Funds, 2121 K St. N.W.,<br>Suite 350 Washington, D.C. 20037 (202) 521-2233 | ATTORNEYS (IF KNOWN)<br>John R. Woodrum, Esq.<br>Ogletree Deakins<br>2400 N Street, N.W. - Fifth Floor<br>Washington, D.C. 20037 (202) 887-0855 |

## II. BASIS OF JURISDICTION
### (PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

● 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government Defendant

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
### (Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**        OR        ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/* *2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ◉ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☒ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

29 U.S.C. SECTION 185 et seq. declaratory and injunctive relief for collection of delinquent Wage Agreement contributions

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $** [ ] Check YES only if demanded in complaint **JURY DEMAND:** YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE 4/15/08   SIGNATURE OF ATTORNEY OF RECORD *Matthew L. Burns*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# **EXHIBIT A**

# UNITED MINE WORKERS OF AMERICA
## 2002 COAL APPENDIX FORM

**District:** 17    **Sub-District:** 3    **Region** II    **Date:** 6/3/04

**\*Name of Company:** Double Bonus Coal Company

**Address of Company:** P.O. Box 1085, Beckley, WV   25802

**Company Phone #:**( 304 ) 252-8528    **Company Fax #:**(304 ) 255-6106

**Name & Title of Company Signer:** Tom Lusk, C.O.D.

**Name of Association, if any (ie: BCOA, IBCBA etc.)**

**Indicate if above company was previously signatory, note when, and name if different from above:**

| DATE | NAME AND ADDRESS |
|------|------------------|

**Indicate company if royalty payments made by other than above:** None

**If mine(s) below were acquired from a previously signatory company, indicate company and date removed from record:** New Company

**Indicate Name of Parent Company:** Double Bonus Coal Co.

**Is it a sub-contractor, lessee, or licensee? Yes_____ No** X

**If so, from whom?**

### LIST ALL MINES COVERED BY THE \*ABOVE-NAMED COMPANY AND MSHA ID NUMBER(S)

| NAME OF MINE(S) & MSHA ID NUMBER(S) | Location of Mine (Town · County · State) | Type of Operation (deep, strip, etc.) | Estimated Annual Tonnage | No. Of Employees | Local Union # |
|---|---|---|---|---|---|
| MSHA ID # 46-09020 | Pinnacle Creek Wyoming  WV | Deep | 200,000 | 25 | 6196 |
| MSHA ID # | | | | | |
| MSHA ID # | | | | | |
| MSHA ID # | | | | | |

**If there is more than one mine with different addresses, please continue with the mine address information on the back of this form.**

**Name of Mine:** Same as above

**Address of Mine:**

**Phone # of Mine:** ( 3^4 ) 732-6638    **Fax # of Mine:** ( 304 ) 255-6106

**Contract Duration:** 6-3-04    to 12-31-06

**Ratification Date:** New Operation

**Contract Expiration Date:** 12-31-06

**Reopener Date:** None

**Name of District Representative:** Roger L. Yates, DEB

**Name & Title of Contract Negotiator:**

```
RECEIVED

SEP 2 2004

COLLECTIVE BARGAINING OFFICE
```

6/3/04
**Date**

*Joseph M. Carter*
**Signature of District President**

08 0661
**FILED**
APR 16 2008

Clerk, U.S. District and
Bankruptcy Courts

REVISED 3-3-94

# AGREEMENT

The parties to this Agreement are _Double Barrus Coal Co._ ("Employer") and the International Union, United Mine Workers of America, on behalf of its members. The parties hereto agree to and adopt each and every term of the 2002 NBCWA, including all Memoranda of Understanding, as well as the Memorandum of Understanding Regarding Job Opportunities. These provisions are hereby incorporated by reference and constitute the agreement between the parties.

**IN WITNESS WHEREOF**, each of the parties signatory hereto has caused this Agreement to be signed on the date specified herein to become effective.

_Tom W. Tush_
**(Authorized Signer for Employer)**

_201034159_
**(Employer Identification Number)**

_C.O.O., Blackstone Coal Corp_
**(Title)**

_Double Barrus Coal Company_
**(Type or Print Name of Employer)**

_P.O. Box 1085_
**(Address)**

_Beckley, W.Va. 25802_
**(City, State, Zip)**

_Freddie Wright_
**(Authorized Signer for UMWA International)**

_Director Region II_
**(Title)**

_Freddie Wright_
**(Type or Print Name)**

_Roger L. Yates_
**(For UMWA District)**

_D.E.B._
**(Title)**

_Roger L. Yates_
**(Type or Print Name)**

**Date:** _June 3, 2004_

**District** _17_    **Local** _2196_



# National Bituminous Coal
# Wage Agreement of 2002

# NATIONAL BITUMINOUS COAL
# WAGE AGREEMENT OF 2002

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **Article I - ENABLING CLAUSE** . . . . . . . . . . . . . . | | 1 |
| **Article IA - SCOPE AND COVERAGE** . . . . . . . | | 3 |
| Section (a) | Work Jurisdiction . . . . . . . . . . . . . | 3 |
| Section (b) | Exemptions Clause . . . . . . . . . . . . | 4 |
| Section (c) | Supervisors Shall Not Perform Classified Work . . . . . . . . . . . . . | 5 |
| Section (d) | Management of the Mines . . . . . . | 5 |
| Section (e) | Union's Rights . . . . . . . . . . . . . | 5 |
| Section (f) | Application of This Contract to the Employer's Coal Lands . . . . . | 6 |
| Section (g) | Contracting and Subcontracting . . | 6 |
| Section (h) | Leasing, Subleasing and Licensing Out of Coal Lands . . . | 8 |
| Section (i) | Construction Work . . . . . . . . . . . | 8 |
| **Article II - JOB OPPORTUNITY AND BENEFIT SECURITY (JOBS)** . . . . . . . . . . . . . . . . . . . . | | 9 |
| A | Non-Signatory Operations of the Signatory Employer . . . . . . . . . . . . . | 10 |
| B | Lessee-Licensee . . . . . . . . . . . . . . . . . . | 13 |
| C | Coordination of Employment Obligations Under the JOBS Program . . . . . . . . . . . . | 17 |
| D-1 | Employer-Wide Panel Rights to Signatory Operations . . . . . . . . . . . . | 18 |
| D-2 | Exhaustion of Employer Panel . . . . . . . . . . . | 18 |
| D-3 | Monitoring of Job Selections . . . . . . . . . . | 18 |
| E | UMWA-BCOA Training and Education Fund . . . . . . . . . . . . . . . . . . . . | 21 |
| F | Skills Training . . . . . . . . . . . . . . . . . . . . | 24 |
| G | UMWA-BCOA Labor Management Positive Change Process ("LMPCP") . . . . . | 26 |
| H | UMWA-BCOA Labor Management Policy Committee . . . . . . . . . . . . . . . . | 36 |
| I | UMWA-BCOA Resolution of Disputes Trust . | 38 |

i

*Contents*

|  |  |  | Page |
|---|---|---|---|
| **Article III - HEALTH AND SAFETY** | | | 38 |
| Section (a) | Right to a Safe Working Place | | 38 |
| Section (b) | Federal Mine Safety and Health Act of 1977, as Amended | | 39 |
| Section (c) | Joint Industry Health and Safety Committee | | 39 |
| Section (d) | Mine Health and Safety Committee | | 40 |
| Section (e) | Access to the Mine | | 43 |
| Section (f) | Reports | | 44 |
| Section (g) | Safety Rules and Regulations | | 45 |
| Section (h) | Cooperation in Development of Mining Plans | | 46 |
| Section (i) | Preservation of Individual Safety Rights | | 46 |
| Section (j) | Physical Examination | | 50 |
| Section (k) | Minimum Age | | 51 |
| Section (l) | Workers' Compensation and Occupational Disease | | 51 |
| Section (m) | Safety Equipment and Protective Clothing Allowance | | 51 |
| Section (n) | Maintenance | | 52 |
| Section (o) | Special Safety Problem Areas | | 53 |
| Section (p) | Settlement of Health or Safety Disputes | | 55 |
| **Article IV - WAGES AND HOURS Traditional Schedules** | | | 56 |
| Section (a) | Basic Work Week | | 56 |
| Section (b) | Basic Work Day | | 57 |
| Section (c) | Alternate Work Schedules | | 58 |
| Section (d) | Lampman | | 59 |
| Section (e) | Saturday, Sunday and Premium Work | | 59 |
| Section (f) | Standard Daily Wage Rate | | 62 |

ii

*Contents*
Page

## Article V - HELPERS ON FACE EQUIPMENT IN UNDERGROUND MINES . . . . . . . . . . . . . . . . . 64
Section (a)   Assignment of Helpers . . . . . . . . . . 64
Section (b)   Duties and Responsibilities of Helpers . . . . . . . . . . . . . . . . . . 65
Section (c)   Exemption . . . . . . . . . . . . . . . . . . . . 66

## Article VI - SHIFTS AND SHIFT DIFFERENTIALS . . . . . . . . . . . . . . . . . . . . . . . 66
Section (a)   Multiple Shifts . . . . . . . . . . . . . . . 66
Section (b)   Hoisting of Coal . . . . . . . . . . . . . 67
Section (c)   Shift Differentials . . . . . . . . . . . . . 67
Section (d)   Working into the Next Shift . . . . . 67
Section (e)   Call-back . . . . . . . . . . . . . . . . . . . . 68
Section (f)   Shift Rotation . . . . . . . . . . . . . . . . 68

## Article VII - MINE COMMUNICATION COMMITTEES . . . . . . . . . . . . . . . . . . . . . . . . 68

## Article VIII - STARTING TIME . . . . . . . . . . . . . . 69
Section (a)   Shift Starting Time . . . . . . . . . . . 69
Section (b)   Lowering Employees . . . . . . . . . 70
Section (c)   Safety and Maintenance . . . . . . . 70
Section (d)   Surface Facilities . . . . . . . . . . . . . 70
Section (e)   Changing Crews at the Face . . . . . 70

## Article IX - ALLOWANCES . . . . . . . . . . . . . . . . 71
Section (a)   Bereavement Pay . . . . . . . . . . . . 71
Section (b)   Jury Duty . . . . . . . . . . . . . . . . . . . 71
Section (c)   Reporting Pay . . . . . . . . . . . . . . . 71
Section (d)   Military Duty . . . . . . . . . . . . . . . . 72
Section (e)   Personal or Sick Leave . . . . . . . . 72
Section (f)   Family and Medical Leave . . . . . . 75

*Contents*

|  |  | Page |
|---|---|---|
| **Article X - WAGE INCREASE** . . . . . . . . . . . . . . . | | 78 |
|  |  |  |
| **Article XI - SICKNESS AND ACCIDENT** | | |
| **BENEFITS** . . . . . . . . . . . . . . . . . . . . . . . . . | | 79 |
| Section (a) | General Purpose . . . . . . . . . . . . | 79 |
| Section (b) | Eligibility . . . . . . . . . . . . . . . . . | 79 |
| Section (c) | Commencement and Duration of | |
|  | Benefits . . . . . . . . . . . . . . . . . | 81 |
| Section (d) | Amount and Payment of Benefits . | 83 |
| Section (e) | Filing of Claims for Benefits . . . . . | 84 |
| Section (f) | Structure and Administration . . . . | 84 |
|  |  |  |
| **Article XII - HOLIDAYS** . . . . . . . . . . . . . . . . . . | | 87 |
| Section (a) | Holidays Observed . . . . . . . . . . . | 87 |
| Section (b) | Sunday Holidays . . . . . . . . . . . . . | 89 |
| Section (c) | Monday Holidays . . . . . . . . . . . . | 89 |
| Section (d) | Pay for Holidays Worked . . . . . . . . | 90 |
| Section (e) | Pay for Holidays Not Worked . . . . | 90 |
| Section (f) | Holidays During Vacation Period . | 90 |
| Section (g) | Birthday Holidays . . . . . . . . . . . . | 90 |
| Section (h) | Holidays for Sick and Injured . . . . | 91 |
| Section (i) | Time of Payment . . . . . . . . . . . . . | 91 |
|  |  |  |
| **Article XIII - REGULAR VACATION** . . . . . . . . . . | | 92 |
| Section (a) | Annual Vacation . . . . . . . . . . . . . | 92 |
| Section (b) | Dates of Regular Vacation Period . | 92 |
| Section (c) | Staggered Regular Vacation . . . . . | 93 |
| Section (d) | Qualifying Period and Amount of | |
|  | Payment . . . . . . . . . . . . . . . . . . | 94 |
| Section (e) | Floating Vacation Days . . . . . . . . . | 96 |
| Section (f) | Time of Payment . . . . . . . . . . . . . | 99 |
| Section (g) | Obligation for Payment . . . . . . . . | 99 |
| Section (h) | Work During Shutdown . . . . . . . . | 100 |

iv

*Contents*
Page

**Article XIV - GRADUATED VACATION** ...... 100
Section (a)   General ................... 100
Section (b)   Definition of Additional Days .... 101
Section (c)   Definition of Continuous
               Employment .............. 101
Section (d)   Amount of Continuous
               Employment .............. 102
Section (e)   Time of Payment ............. 103
Section (f)   Rate of Payment ............. 103
Section (g)   Scheduling and Pay in Lieu ..... 103
Section (h)   Sick and Injured Employees ..... 104

**Article XV - CHECKOFF** ................... 104

**Article XVI - TRAINING** ................... 105
Section (a)   Priority .................... 105
Section (b)   Orientation for New Employees .. 106
Section (c)   General Retraining Programs .... 110
Section (d)   Safety Training for Specific Job ... 113
Section (e)   Maintenance Training and
               Rate of Pay ............... 113
Section (f)   New Inexperienced Employees at
               Underground Mines .......... 115
Section (g)   General Training Provisions ..... 115
Section (h)   Skills Enhancement ........... 116

**Article XVII - SENIORITY** ................. 117
Section (a)   Definition of Seniority ........ 117
Section (b)   Reduction; Realignment ........ 117
Section (c)   Layoff Procedure ............ 121
Section (d)   Panels .................... 122
Section (e)   Panel Custodians ............ 122
Section (f)   Panel Members Accrue Seniority . 123
Section (g)   Right to be Recalled .......... 124
Section (h)   Recall of Persons on Layoff Status 124

v

*Contents*

|  |  | Page |
|---|---|---|
| Section (i) | Job Bidding | 126 |
| Section (j) | Training for Vacancy Not Filled by Bidding | 130 |
| Section (k) | Transfer to Other Mines of Employer | 131 |
| Section (l) | Leave of Absence | 133 |
| Section (m) | Permanent and Temporary Supervisors | 133 |
| Section (n) | Shift Preference | 134 |

**Article XVIII - TONNAGE RATES AND HAND LOADING** . . . . . . . . . . . . . . . . . . . . . 134

| Section (a) | Tonnage Rates | 134 |
|---|---|---|
| Section (b) | Checkweighman | 134 |
| Section (c) | Preparation and Cleaning of Coal | 136 |
| Section (d) | Delivery of Cars | 137 |
| Section (e) | Explosives | 137 |
| Section (f) | Bottom Coal | 137 |
| Section (g) | Cutting Coal | 138 |
| Section (h) | Blacksmithing | 138 |
| Section (i) | Rockdusting | 138 |
| Section (j) | Day Men Transferred | 138 |

**Article XIX - CLASSIFICATION** . . . . . . . . . . . . . 138

| Section (a) | Working in Classification | 138 |
|---|---|---|
| Section (b) | Classification Requirement | 138 |
| Section (c) | Temporary Assignments | 139 |
| Section (d) | Protection Against Discrimination | 139 |
| Section (e) | Compensation for Temporary Assignments | 139 |

**Article XX - HEALTH AND RETIREMENT BENEFITS** . . . . . . . . . . . . . . . . . . . . . 140

| Section (a) | General Purpose | 140 |
|---|---|---|
| Section (b) | 1950 Pension Plan and Trust | 142 |

vi

*Contents*
Page

| | | |
|---|---|---|
| Section (c) | 1974 Pension Plan and Trust, 1993 Benefit Plan and Trust, and Employer Benefit Plans .... | 143 |
| Section (d) | Contributions by Employers ..... | 148 |
| Section (e) | Responsibilities and Duties of Trustees ................. | 157 |
| Section (f) | Audits, Reports and Notices ..... | 159 |
| Section (g) | Administration of Trusts ........ | 161 |
| Section (h) | Guarantee of 1950 and 1974 Plans and Trusts ................. | 163 |

## GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS

| | | |
|---|---|---|
| | ................. | 164 |
| (1) | Pensions for Miners Retired Under the 1950 Pension Plan ..................... | 168 |
| (1A) | 1950 Widows' Pension ............................... | 171 |
| (2) | Pensions for Miners Who Retired Under the 1974 Pension Plan Prior to the Effective Date ........................... | 172 |
| (3) | Pensions for Miners Who Retire on or after the Effective Date ............................... | 175 |
| (4) | Signatory Service ............................... | 178 |
| (5) | Pensions for Disabled Miners ...................... | 180 |
| (6) | Pensions for Surviving Spouses .................. | 181 |
| (6A) | Pre-retirement Survivor's Pension .............. | 184 |
| (7) | Deferred Vested or Special Pensions .......... | 185 |
| (7A) | Pension Bonuses ........................................ | 191 |
| (8) | Life and Accidental Death and Dismemberment Benefits ........................... | 192 |
| (9) | Pensioner's Death Benefits ........................... | 193 |
| (10) | Health Care ................................................... | 195 |
| (11) | Vision Care ................................................... | 208 |
| (12) | Health Care Cost Containment .................... | 208 |
| (13) | National Health Care ..................................... | 210 |

vii

*Contents*

| | | Page |
|---|---|---|
| **Article XXA - DENTAL PLAN** | | 210 |
| Section I | Definitions | 211 |
| Section II | Eligibility | 212 |
| Section III | Benefits | 214 |
| Section IV | Termination of Coverage | 229 |
| Section V | Schedule of Benefits | 230 |
| | | |
| **Article XXB - UMWA CASH DEFERRED SAVINGS PLAN OF 1988** | | 246 |
| Section (a) | General Purpose | 246 |
| Section (b) | Trust | 246 |
| Section (c) | Plan | 247 |
| Section (d) | Funding | 247 |
| Section (e) | Administration | 248 |
| Section (f) | Investments | 250 |
| Section (g) | Plan and Trust Provisions | 251 |
| | | |
| **Article XXI - SURFACE MINES** | | 252 |
| Section (a) | Parking Areas | 252 |
| Section (b) | Manning of Surface Mining Equipment | 253 |
| Section (c) | Eating Place | 255 |
| Section (d) | Cabs | 255 |
| Section (e) | Special Health and Safety Problems in Surface Mines | 255 |
| Section (f) | Toilets | 257 |
| Section (g) | Swing Shift | 257 |
| Section (h) | Leasing of Employees' Vehicles | 258 |
| Section (i) | Production and Processing of Coal at Surface Mines | 258 |
| | | |
| **Article XXII - MISCELLANEOUS** | | 259 |
| Section (a) | Bathhouse | 259 |
| Section (b) | Access Roads | 259 |
| Section (c) | Parking Facilities | 260 |

viii

*Contents*
Page

Section (d)    Bulletin Boards ............... 260
Section (e)    Coke and Cleaning Plants ....... 260
Section (f)    Compulsory Retirement ........ 260
Section (g)    House Coal ................. 260
Section (h)    House Rent ................. 261
Section (i)    Attendance Control ........... 261
Section (j)    Memorial Periods ............ 264
Section (k)    Closing Following Fatal Accident  264
Section (l)    New Machinery ............... 265
Section (m)    Pay Day .................... 266
Section (n)    Lunches .................... 266
Section (o)    Portals .................... 266
Section (p)    Tools ...................... 267
Section (q)    Tramming ................... 267
Section (r)    Local Union Meeting Place ..... 267
Section (s)    Bonus Plans ................. 267

**Article XXIII - SETTLEMENT OF DISPUTES** .. 269
Section (a)    Mine Committee .............. 269
Section (b)    District Arbitrators ........... 271
Section (c)    Grievance Procedure .......... 273
Section (d)    Ten Day Limitation ........... 276
Section (e)    Earnest Effort to Resolve Disputes  276
Section (f)    Employee's Right to Presence of
               Member of Mine Committee ... 277
Section (g)    Right of Grievant to be Present ... 277
Section (h)    Finality of Decision or Settlement  277
Section (i)    Exclusion of Legal Counsel ..... 278
Section (j)    Waiver of Time Limits ......... 278
Section (k)    Prior Agreement ............. 278

**Article XXIV - DISCHARGE PROCEDURE** .... 279
Section (a)    Just Cause Required .......... 279
Section (b)    Procedure .................. 279
Section (c)    Suspension ................. 280

ix

*Contents*

| | | Page |
|---|---|---|
| Section (d) | Immediate Arbitration . . . . . . . . . | 280 |
| Section (e) | Regular Arbitration . . . . . . . . . . . | 281 |
| Section (f) | Compensation for Lost Earnings . | 281 |

**Article XXV - DISCRIMINATION PROHIBITED**    281

**Article XXVI - DISTRICT AGREEMENTS** . . . . .   282
| Section (a) | New Districts . . . . . . . . . . . . . . . | 282 |
| Section (b) | Prior Practice and Custom . . . . . . | 282 |
| Section (c) | Protective Wage Clause . . . . . . . . | 283 |
| Section (d) | Approval of District Agreements . | 283 |

**Article XXVII - MAINTAIN INTEGRITY OF
CONTRACT AND RESORT TO COURTS** . . .   283

**Article XXVIII - SEVERABILITY CLAUSE** . . . . .   284
| Section (a) | General Rule . . . . . . . . . . . . . . . | 284 |
| Section (b) | Exception . . . . . . . . . . . . . . . . . | 284 |

**Article XXIX - RATIFICATION AND TERMINATION
OF THIS AGREEMENT** . . . . . . . . . . . . . . . . . .   285

**Letter Regarding Mediation** . . . . . . . . . . . . . . .   287

**Letter Regarding Special Permanent Layoff
Pension** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   288

**Memorandum of Understanding Regarding
Job Opportunities** . . . . . . . . . . . . . . . . . . . .   289
Appendix B - Request for Employment . . . . . . . . .   300
Bituminous Coal Operators' Association, Inc.
Companies for Which BCOA was Authorized to
Represent for the Negotiation of this Agreement . .   302

X

*Contents*
Page

**Pension Tables** . . . . . . . . . . . . . . . . . . . . . . . . . . . 303

**Appendix A - Part I**
    Wage Rates Underground at Deep Mines . . . . . . . . 310

**Appendix A - Part II**
    Wage Rates at Strip and Auger Mines . . . . . . . . . . 312

**Appendix A - Part III**
    Wage Rates at Preparation Plants and Other Surface
     Facilities for Deep or Surface Mines . . . . . . . . . . 314

**Appendix B - Part I**
    Job Classifications Underground at Deep Mines . . . 316

**Appendix B - Part II**
    Job Classifications at Strip and Auger Mines . . . . . 323

**Appendix B - Part III**
    Job Classifications at Preparation Plants and Other
     Surface Facilities for Deep or Surface Mines . . . . 328

**Appendix C**
    Alternative Schedules . . . . . . . . . . . . . . . . . . . . . . 336

**Index** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 353

xi

xii

# NATIONAL BITUMINOUS COAL WAGE AGREEMENT OF 2002

## Article I—ENABLING CLAUSE

THIS AGREEMENT, made this 1st day of January, 2002 between the coal operators and associations signatory hereto, as parties of the first part (each coal operator which is a signatory hereto being called "Employer") and the International Union, United Mine Workers of America (hereinafter called "Union"), on behalf of each member thereof, as party of the second part, covers all of the bituminous coal mines described in Article IA, Section (f), owned or operated by said first parties. This Agreement carries forward and preserves the terms and conditions of all the various District agreements executed between the United Mine Workers of America and the various operators and coal associations subject to the terms and conditions of this Agreement and as amended, modified and supplemented by this Agreement as herein set out.

This Agreement shall be binding upon all signatories hereto, including those Employers which are members of signatory associations, and their successors and assigns. In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the

1

Art. I

agreement of the successor to assume the Employer's obligations under this Agreement. Immediately upon the conclusion of such sale, conveyance, assignment or transfer of its operations, the Employer shall notify the Union of the transaction. Such notification shall be by certified mail to the Secretary-Treasurer of the International Union and shall be accompanied by documentation that the successor obligation has been satisfied. Provided that the Employer shall not be a guarantor or be held liable for any breach by the successor or assignee of its obligations, and the UMWA will look exclusively to the successor or assignee for compliance with the terms of this Agreement.

WITNESSETH: It is agreed that this contract is for the exclusive joint use and benefit of the contracting parties, as defined and set forth in this Agreement. It is agreed that at operations covered by this Agreement the United Mine Workers of America is recognized herein as the exclusive bargaining agency representing the Employees of the parties of the first part. It is further agreed that as a condition of employment all Employees at operations covered by this Agreement shall be, or become, members of the United Mine Workers of America, to the extent and in the manner permitted by law, except in those exempted classifications of employment as hereinafter provided in this Agreement. This provision does not change the rules or practices of the industry pertaining to management. The Mine Workers intend no intrusion upon the rights

2

of management as heretofore practiced and understood. It is the intent and purpose of the parties hereto that this Agreement will promote and improve industrial and economic relationships in the bituminous coal industry and to set forth herein the basic agreements covering rates of pay, hours of work and conditions of employment to be observed between the parties, and shall cover the employment of persons employed in the bituminous coal mines covered by this Agreement. Management will not abridge the rights of the Employees as set forth in this Agreement.

## Article IA—SCOPE AND COVERAGE

### Section (a)    Work Jurisdiction

The production of coal, including removal of overburden and coal waste, preparation, processing and cleaning of coal and transportation of coal (except by waterway or rail not owned by Employer), repair and maintenance work normally performed at the mine site or at a central shop of the Employer and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above shall be performed by classified Employees of the Employer covered by and in accordance with the terms of this Agreement. Contracting, subcontracting, leasing and subleasing, and construction work, as defined herein, will be conducted in accordance with the provisions of this Article.

3

Art. IA

Nothing in this section will be construed to diminish the jurisdiction, express or implied, of the United Mine Workers.

*Section (b)*   **Exemptions Clause**

It is the intention of this Agreement to reserve to the Employers and except from this Agreement an adequate force of supervisory employees to effectively conduct the safe and efficient operation of the mines and at the same time, to provide against the abuse of such exemptions by excepting more such employees than are reasonably required for that purpose.

Coal inspectors and weigh bosses at mines where men are paid by the ton, watchmen, clerks, engineering and technical forces of the Employer, working at or from a district or local mine office, are exempt from this Agreement.

All other Employees working in or about the mine shall be included in this Agreement except essential supervisors in fact such as mine foremen, assistant mine foremen who, in the usual performance of their duties, may make examinations for gas as prescribed by law, and such other supervisors as are in charge of any class of labor inside or outside the mines and who perform no production work.

The Union will not seek to organize or ask recognition for such excepted supervisory employees during the life of this contract.

The Employers shall not use this provision to ex-

4

Art. XX

shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

## Article XX—HEALTH AND RETIREMENT BENEFITS

### Section (a) General Purpose

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

Pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), the health benefits (and in some cases the death benefits) provided to retirees who were age and service eligible as of February 1, 1993,

and who actually retired by September 30, 1994, are guaranteed by an Act of Congress. The Coal Act, which was enacted with the active support of the United Mine Workers of America and the BCOA, requires responsible employers to provide and pay for these benefits for life. Although, under certain circumstances, employers are permitted to adopt cost containment and managed care programs, the levels of benefits provided to retirees and dependents covered by the Coal Act are fixed by law, and may not be changed by any employer.

Benefits under the Coal Act are provided either by the employer who was providing those benefits on February 1, 1993, or by two newly-created Funds: the United Mine Workers of America Combined Benefit Fund and the United Mine Workers of America 1992 Benefit Plan. Those benefits are not governed by this Agreement.

For purposes of this Article, the 1950 Pension Plan and Trust and the 1974 Pension Plan and Trust shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund).

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the 1993 Benefit Trust, or the individual benefit plans referred to in Section

Art. XX

(c). An individual that is entitled to health benefits from a plan maintained pursuant to the Coal Act will receive benefits from such plan, and not from a plan maintained pursuant to this Article. In addition, an individual that is entitled to death benefit coverage from the United Mine Workers of America Combined Benefit Fund shall not be entitled to death benefit coverage from any plan maintained pursuant to this Article.

The general purpose of the plans referred to in this Article shall be to provide health care for working and retired miners and their dependents; pensions for miners upon their retirement; health care and financial support for eligible disabled miners; and financial support for surviving spouses and surviving dependents provided by each of the Trusts and Plans referred to in this Article.

Except as otherwise specifically set forth in this Article, it is agreed that the Trusts referred to in this Article are irrevocable Trusts created pursuant to, and within the scope of, Section 302(c) of the Labor-Management Relations Act, 1947, and shall endure as long as the purposes for their creation shall exist.

## Section (b) 1950 Pension Plan and Trust

(1) The United Mine Workers of America 1950 Pension Trust ("1950 Pension Trust") is incorporated by reference and made a part of this Agreement. The United Mine Workers of America 1950 Pension Plan (the "1950 Pension Plan") is incorporated by refer-

142

Art. XX

ence and made a part of this Agreement. The pensions to be paid from the 1950 Pension Trust are as set forth in the 1950 Pension Plan.

(2) Pursuant to the requirements of the Coal Act, the United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust") and the United Mine Workers of America 1974 Benefit Plan and Trust (the "1974 Benefit Trust") were merged into the United Mine Workers of America Combined Benefit Fund (the "Combined Fund"). The Combined Fund is governed by the terms of the Coal Act, and is not maintained pursuant to this Article. Health benefits for individuals who would be eligible for benefits under the 1950 Benefit Plan but for the passage of the Coal Act and who are not entitled to benefits under the Coal Act will be provided by the 1993 Benefit Fund during the term of this Agreement.

(3) Upon the discharge of all its obligations, any remaining assets in the 1950 Pension Trust shall, upon termination of such Trust, be transferred to the 1974 Pension Trust.

Section (c)  **1974 Pension Plan and Trust, 1993 Benefit Plan and Trust, and Employer Benefit Plans**

(1) The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are

143

Art. XX

as set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement. This Plan is a continuation of the pension program of the 1950 Fund and was effective December 6, 1974.

   . (2) The United Mine Workers of America 1993 Benefit Trust ("1993 Benefit Trust") is incorporated by reference and made a part of this Agreement. The 1993 Benefit Trust provides certain health benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1993 Benefit Trust and under the terms of this Article.

   (3)(i) Each signatory Employer shall establish and maintain an Employee benefit plan to provide, implemented through an insurance carrier(s), health and other non-pension benefits for its Employees covered by this Agreement as well as pensioners under the 1974 Pension Plan and Trust whose last signatory classified employment was with such Employer and who are not eligible to receive benefits from a plan maintained pursuant to the Coal Act. The benefits provided by the Employer to its eligible Participants pursuant to such plan shall be guaranteed during the term of this Agreement by that Employer at levels set forth in such plan. The plans established pursuant to this subsection are incorporated by reference and made a part of this Agreement, and the terms and

144

Art. XX

conditions under which the health and other non-pension benefits will be provided under such plans are as to be set forth in such plans.

(ii) The 1993 Benefit Plan and Trust provides health and other non-pension benefits during the term of this Agreement, to any retired miner (or the eligible dependent of such retired or deceased miner) who meets the conditions of one of the following:

(a) The retired miner is described in Section (b)(2).

(b) The retired miner separated from classified employment prior to December 16, 1993, would be eligible to receive benefits from the 1974 Benefit Plan but for the passage of the Coal Act, is not entitled to benefits under the Coal Act, and whose last signatory employer was no longer deriving revenue from the production of coal on December 16, 1993.

(c) The miner is retired under the 1974 Pension Plan or any successor plan(s) thereto, last worked in signatory classified employment for an Employer who was obligated to contribute and contributed to the 1993 Benefit Trust at the rates specified in Section (d) and would otherwise cease to receive the health and other non-pension benefits provided herein because such last signatory Employer (including successors and assigns) is no longer in business. An Employer's obligation to contribute at the rates specified in Section (d) must be in effect on the date the Employer is first considered to be "no longer in business." For purposes of determining eligibility

145

Art. XX

under the 1993 Benefit Plan and Trust, the Employer is considered to be "no longer in business" only if the Employer meets the conditions of (I) and (II) below. The parties expressly intend that each of the requirements of (I) and (II) be met.

(I) The Employer has ceased all mining operations and has ceased employing persons under this Wage Agreement, with no reasonable expectation that such operations will start up again; and

(II) The Employer is financially unable (through either the business entity that has ceased operations as described in subparagraph (a) above, including such company's successors or assigns, if any, or any other related division, subsidiary, or parent corporation, regardless of whether covered by this Wage Agreement or not) to provide health and other non-pension benefits to its retired miners and surviving spouses.

In the case of an otherwise qualifying last signatory Employer that first became obligated to contribute to the 1993 Trust after December 31, 2001, within the meaning of Section (d)(1)(iii) of this Article, and that did not contribute to the 1993 Benefit Trust substantially all amounts owed and at the rates specified in Section (d), eligible retired miners and dependents shall receive only limited coverage under a separate program of benefits designed by the Plan's Trustees. The Trustees shall design the program taking into account the need for the Plan to remain sol-

146

Art. XX

vent throughout the term of this Agreement, while providing more complete benefits for individuals whose last signatory Employer met the "substantially all" contribution requirement of this Article.

Each Employer is required to maintain, and make available to the Trustees, those business and financial records that may be necessary to determine whether the eligibility requirements of the 1993 Benefit Trust have been satisfied. If a miner's last signatory Employer ceases to provide health benefits as required under Section (c)(3)(i) of this Article, and the Trustees are investigating whether the Employer is "no longer in business" within the meaning of Section (c)(3)(ii)(c) of this Article, the Employer shall make available to the Trustees those business and financial records that may be necessary to the "no longer in business" determination, including but not limited to financial statements, tax returns, bank statements, coal production and sales data, and information on equipment and other property and assets of the signatory Employer. The Trustees shall make their initial determination of whether an Employer is "no longer in business" no later than 90 days following receipt of such business and financial records, as practicable.

(d) The retired miner worked under the terms of the 1974 NBCWA (but not under the terms of the 1978 NBCWA), has been or would have been denied a benefit by the UMWA 1974 Benefit Plan solely because the miner did not work under the terms of a

147

Art. XX

1978 or subsequent NBCWA; and is not eligible to receive benefits under the Coal Act.

The Union and Trustees shall assist and fully cooperate with the Employers in obtaining all necessary opinion letters, exemptions, or rulings from the Department of Labor, the Internal Revenue Service or other applicable federal agencies, in order to implement the provisions of this subsection so as to ensure compliance with all applicable federal laws and regulations and ensure the deductibility for income tax purposes of any and all contributions made by signatory Employers to the 1993 Benefit Trust and the individual health plans referred to in this Section.

*Section (d)* **Contributions by Employers**

（1) During the life of this Agreement, for the periods of time indicated below, each signatory Employer (including those engaged in the production of coal and those not engaged in the production of coal) shall contribute to the Trusts referred to in this Article the amounts specified below based on cents per hours worked by each of the Employer's Employees who perform classified work under this Agreement.

(i) Into the 1950 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per hour on each such hour worked;

(ii) Into the 1974 Pension Trust: for the period beginning on the Effective Date and ending when this

148

Art. XX

Agreement is terminated, 0.0¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1974 Pension Trust meeting the required standard of such Trust; and $0.75 per hour on each such hour worked for any Employer that became obligated to contribute for the first time on or after January 1, 2002.

(iii) Into the 1993 Benefit Trust: for the period beginning on the Effective Date and ending the day prior to the first anniversary of the Effective Date, 13¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 75¢ per hour on each such hour worked for any Employer that became obligated to contribute for the first time on or after January 1, 2002; and for the period beginning on the first anniversary of the Effective Date and ending when this Agreement is terminated, 50¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to

149

Art. XX

make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 75¢ per hour on each such hour worked for any Employer that became obligated to contribute for the first time on or after January 1, 2002; provided that the obligation of each signatory Employer to make contributions into the 1993 Benefit Trust shall be suspended at any time that the net assets available for future benefits equal or exceed $20 million, and shall not resume following any such suspension until such time as the net assets available for future benefits are less than $15 million. For purposes of this subdivision, "net assets available for future benefits" is the amount shown as such on the 1993 Benefit Plan monthly financial statement, under "Statements of Net Assets Available for Plan Benefits."

(iv) In addition to the contributions indicated above, during the life of the Agreement, each signatory Employer shall, for the periods of time indicated below, contribute to the Trusts established in this Article in the amounts shown below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal after production by another operator, procured or acquired by such Employer for use or for sale on which contributions to the appropriate Trusts as provided for in this Article have not been made (amounts shown below include cents per hours worked contributions converted to tonnage equivalents).

150

Art. XX

(a) Into the 1950 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per ton on each such ton;

(b) Into the 1974 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per ton on each such ton for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1974 Pension Trust meeting the required standard of such Trust; and 14.5¢ per ton on each such ton for any Employer that became obligated to contribute for the first time on or after January 1, 2002; and

(c) Into the 1993 Benefit Trust: for the period beginning on the Effective Date and ending the day prior to the first anniversary of the Effective Date, 2.5¢ per ton on each such ton for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 14.5¢ per ton on each such ton for any Employer that became obligated to contribute for the first time on or after January 1, 2002; and for the period beginning on the first anniversary of the Effec-

151

Art. XX

tive Date and ending when this Agreement is termi-
nated, 10¢ per ton on each ton for any Employer, in-
cluding related persons to such Employer within the
meaning of Section 9701(c)(2) of the Internal Rev-
enue Code, that initially entered into an agreement
prior to January 1, 2002 to make contributions to the
1993 Benefit Trust meeting the required standard of
such Trust; and 14.5¢ per ton on each such ton for
any Employer that became obligated to contribute for
the first time on or after January 1, 2002; subject to
the provision regarding suspension of the contribu-
tion obligation in (iii) above.

The parties hereto mutually agree that, if at any
time during the term of this Agreement a court or tri-
bunal of competent jurisdiction determines by a final
decision that is not appealable that the provision ap-
pearing in paragraph (iv) just preceding is invalid or
in violation of the National Labor Relations Act,
1947, as amended, or other Federal or state law, the
parties shall, at the option of and upon demand by the
Union, without affecting the integrity of any other
provision of this Section or any other provision of the
National Bituminous Coal Wage Agreement, meet
and engage in good faith negotiations to agree upon a
clause to be inserted into this Agreement in replace-
ment of the provision found invalid or unlawful.

(v) In the event the BCOA ceases to exist, or in the
event that more than 50% of the tonnage membership
of BCOA on the Effective Date has withdrawn prior

152

Art. XX

to the time when the BCOA is required or permitted to take action under this Article, then such action may be taken by a majority vote, based on tonnage, of Employers who were BCOA members on the Effective Date.

(vi) At any time during the term of this Wage Agreement, the Bituminous Coal Operators' Association may reallocate the contributions to be paid under the respective subdivisions (i) and (ii) in this Section, which reallocation will increase the cents per hour to be contributed into the 1950 Pension Trust and correspondingly will decrease the cents per hour to be contributed by the Employers into the 1974 Pension Trust, or which will decrease the cents per hour to be contributed into the 1950 Pension Trust and correspondingly will increase the cents per hour to be contributed by the Employers into the 1974 Pension Trust, provided that notice shall be given to the Union, and to the Trustees (who shall in turn notify all contributing Employers) of the cents per hour to be allocated to each such Trust at least 30 days prior to the date the contributions become due and owing to the respective Trusts. No reallocation of the contributions to be paid to the two Trusts shall be made which will increase the total combined contributions required by this Article to be made by the Employers to those two Trusts.

(vii) Hours of work for purposes of Employer contributions to the plans and trusts described in this Article shall include all hours worked, or fractions

153

Art. XX

thereof, by Employees in a classified job covered by this Agreement. Hours actually worked for which a premium pay of any type is provided shall be treated for purposes of Employer contributions to the Trusts as though worked on a straight-time basis. Reporting pay for hours not actually worked shall not be included for the purpose of making Employer contributions to the Trust.

(2) The sole obligation under this Section of any Employer signatory hereto shall be to contribute the amounts specified in this Section.

(3) The obligation to make payments to the Trusts specified in this Article shall become effective on the dates specified in the respective Subdivisions (i) through (iv) of this Section, and the first payments are to be made on the 10th day of each month after such specified dates, and thereafter continuously on the 10th day of each succeeding calendar month.

(4) It shall be the duty of each of the Employers signatory hereto to keep current said payments due to the Trusts, and to furnish to the International Union, United Mine Workers of America and to the Trustees of those Trusts a monthly statement showing on a mine-by-mine basis the full amounts due hereunder and the tons of coal produced, procured or acquired for use or for sale and the hours worked with respect to which the amounts are payable. Payments to those Trusts shall be made by check payable, as appropriate, to:

154

Art. XX

"Trustees of the United Mine Workers of America 1950 Pension Trust"

"Trustees of the United Mine Workers of America 1974 Pension Trust"

"Trustees of the United Mine Workers of America 1993 Benefit Trust"

The Trustees are hereby authorized to require each signatory Employer to make payment of all contributions to the 1993 Benefit Trust, the 1950 Pension Trust and the 1974 Pension Trust by a single check made payable in such manner as may be specified by the Trustees.

(5) Payments shall be delivered or mailed to such location as designated by the Trustees of those Trusts.

(6) Failure of any Employer signatory hereto to make full and prompt payments to the Trusts specified in this Article in the manner and on the dates herein provided shall be deemed a violation of this Agreement. This obligation of each Employer signatory hereto, which is several and not joint, to so pay such sums shall be a direct and continuing obligation of said Employer during the life of this Agreement and it shall be deemed a violation of this Agreement, if any mine, preparation plant or other facility to which this Agreement is applicable shall be sold, leased, subleased, assigned, or otherwise disposed of for the purpose of avoiding any of the obligations hereunder.

155

Art. XX

(7) Each Employer agrees to give proper notice to the president of the appropriate local union by the 18th day of each month that the Employer has made the required payment to the Trusts for the previous month, as required by this Article, or is delinquent in such payment, such notice to set forth the amount paid to the Trusts, or the amount of the delinquency, the tonnage procured or acquired for use or for sale and the hours worked with respect to the mine or mines under the jurisdiction of such local union. Each Employer agrees to give notice to the appropriate president of the local union by the 18th day of each month that the Employer has made the appropriate payment to the insurance carrier for the Employer benefit plan established under (c)(3) above, or is delinquent in such payment.

(8) Title to all the monies paid into and/or due and owing to the Trusts specified in this Article shall be vested in and remain exclusively in the Trustees of those Trusts. It is the intention of the parties hereto that those Trusts shall constitute irrevocable trusts and that no benefits or money payable from those Trusts shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and that any attempt so to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void.

(9) It is understood that the individual Employees of Employers agree, through their representative, the

156

Art. XX

United Mine Workers of America, to surrender any personal or individual right to or interest in monies paid or required to be paid to the Trusts pursuant to this Agreement.

(10) Any judgment obtained by the Trustees of the Trusts established pursuant to this Agreement for a default giving rise to damages accruing to more than one of the Trusts established hereunder shall be allocated by the Trustees among such Trusts in proportion to the amounts owing to each which gave rise to such judgment.

## Section (e) Responsibilities and Duties of Trustees

(1) The 1950 Pension Trust, the 1974 Pension Trust, and the 1993 Benefit Trust shall each be administered by a Board of four Trustees, two of whom shall be appointed by the Employers and two of whom shall be appointed by the Union. Either party may, but shall not be required to, appoint an individual to serve as a Trustee on more than one Trust. One of the Trustees appointed by the Union shall be the Chairman. Each Board of Trustees shall perform its duties in accordance with the requirements, terms and conditions of each such Trust.

(2) It is the intent and purpose of the contracting parties that full cooperation shall be given by each of them to one another, to the Trustees provided for under this Article, and to all affected mine workers, to the eventual coordination and development of poli-

157

Art. XX

cies and working agreements necessary or advisable for the effective operation of the Trusts and Plans.

(3) Action which may be required by the Employers in connection with any matter hereunder, including but not limited to the removal or appointment of a Trustee, may be taken by BCOA.

(4) All covenants, rights and obligations accruing to the Trusts, and the Benefit Plan, and the Trustees of the Pension and Benefit Trusts and Plans, and all breaches, violations and/or defaults of any provision of this Article pertaining to the Trusts and Plans, the Trust Agreements, or Pension Plans, shall be enforced by the Trustees, at their discretion, through any and all available legal means, without first exhausting the grievance and arbitration procedures set forth in this Agreement.

(5) Disputes arising under this Agreement with regard to the Employer benefit plan established in (c)(3) above shall be referred to the Trustees. The Trustees shall develop procedures for the resolution of such disputes. In the event the Trustees decide such dispute, such decision of the Trustees shall be final and binding on the parties. If the Trustees are unable to resolve the dispute, such dispute shall be referred to a permanent three-member arbitration panel selected by mutual agreement of the UMWA and the BCOA and maintained by the Trustees. A dispute referred in this manner shall be decided by one member of the arbitration panel, determined on a

Art. XX

rotating basis, whose decision shall be final and binding on the parties. Precedent under the resolution of disputes mechanism previously in place shall remain in effect, and the panel shall be required to cooperate to assure the consistent interpretation of provisions under the Employer Plans under this Article. Such disputes shall not be processed under the provisions of Article XXIII (Settlement of Disputes).

*Section (f)* **Audits, Reports and Notices**

(1) It is agreed by the contracting parties that annual independent audits of the Trusts shall be made by independent certified public accountants to be designated by the Trustees of the Trusts. A statement of the results of such audits shall be sent to the contracting parties and shall be made available upon written request to any working or retired miner or to any beneficiary either by mail or at the principal office of the Trusts, or at such other place as may be designated by the Trustees.

(2) If the Trustees determine that there is reasonable cause to question the accuracy of the sums paid under Section (d) of this Article, or of any verification thereof made by an Employer for a given monthly or annual period, the Employer shall, upon written request by the Trustees, make available for inspection and/or copying at reasonable times and places to a representative of the Trustees, those records which are necessary to verify the accuracy of the sums paid.

159

Art. XX

(3) A complete accounting, on a mine-by-mine basis, of contributions received by the Trusts under this Article shall be furnished by the Trustees, at least on a quarterly basis, to the International Union. Such an accounting will also be supplied to the district and local offices of the Union with respect to the mine or mines under their jurisdiction. Such accounting shall include tonnages of coal procured or acquired for use or for sale, and hours worked with respect to which contributions were paid, together with an identification of any period or periods in which contributions were delinquent, showing the amounts of such delinquencies. The Trustees shall take such action as they deem appropriate to collect any such delinquencies, and shall advise the International Union and the appropriate districts and locals of the Union, on at least a monthly basis, of such delinquencies, as long as such delinquencies continue.

(4) Upon the written request of any International, District or Local officer of the Union, the Trustees shall make available within seven (7) days of receipt of such request an up-to-date accounting of contributions made and delinquencies outstanding, in respect to any mine or related facility with respect to which such officer has union jurisdiction.

(5) The Trustees shall furnish the Employers and the Union with such other documentation and information as provided for in each of the Trusts described herein.

160

Art. XX

*Section (g)* **Administration of Trusts**

(1) Each Employer shall make available to the Trustees within a reasonable time such information as the Trustees may determine to be reasonably required for the purpose of administering the Trusts and Plans.

(2) The Trustees shall respond to all written requests for information, applications, and other communications from beneficiaries within 15 working days from their receipt at the office of the Trusts. A response from the Trustees may be either a telephonic communication or a letter acknowledging receipt of such communication from the beneficiary. A pension application must be initially approved or denied within 12 weeks of the receipt of the application. The foregoing shall not apply in the event of delays caused by conditions beyond the control of the Trustees.

(3) The Trustees shall police and monitor the rolls of those entitled to benefits from the Trusts. On at least a quarterly basis, the Trustees shall have available a complete listing of current beneficiaries, identified by UMWA district and local union jurisdiction, if applicable. The Trustees shall promptly investigate and determine the eligibility or ineligibility of any beneficiary whose right to receive benefits from the Trusts has been challenged by an Officer of the International, District or Local Union or by any Employer.

161

Art. XX

In the event that a beneficiary or beneficiaries shall be determined to be ineligible for health care or other benefits, the Trustees shall take prompt action to correct the situation.

(4) The Trustees are authorized, upon prior written approval by the Employers and the Union, to make such changes in the Plans and Trusts hereunder as they may deem to be necessary or appropriate.

They are also authorized and directed, after adequate notice and consultation with the Employers and Union, to make such changes in the Plans and Trusts hereunder, including any retroactive modifications or amendments, which shall be necessary:

(a) to obtain all necessary determination letters or rulings from the Internal Revenue Service or other applicable federal agencies so as to ensure compliance with all applicable federal laws and regulations and ensure the continued qualification of the 1950 and 1974 Pension Plans and Trusts and the deductibility for income tax purposes of any and all contributions made by signatory Employers to such Trusts as paid or incurred;

(b) to conform the terms of each Plan and Trust to the requirements of ERISA, or any other applicable federal law, and the regulations issued thereunder;

(c) to obtain determination letters from the Internal Revenue Service that the two Pension Plans will each meet the requirements of Section 401 of the Internal Revenue Code and the Trusts thereun-

162

Art. XX

der will be exempt under Section 501(a) of such Code and that the 1993 Benefit Trust will be exempt under Section 501(c)(9) of such Code;

(d) to establish the deductibility for income tax purposes of any and all contributions made by the signatory operators to the Pension Trusts and Benefit Trust as paid or incurred; or

(e) to comply with all applicable court or government decisions or rulings.

In addition to the foregoing, the 1993 Benefit Plan Trustees shall have the authority to make any amendments to the plan of benefits of the 1993 Benefit Plan and Trust that they deem necessary and appropriate.

## Section (h)  Guarantee of 1950 and 1974 Plans and Trusts

Notwithstanding any other provisions in this Agreement, the Employers hereby agree to fully guarantee the pension benefits provided by the 1950 Pension Fund and the 1974 Pension Fund, during the term of this Agreement.

In order to fully fund these guaranteed benefits, the BCOA may increase, not decrease (except as provided in Section (d)(1)), the rate of contributions to be made to the 1950 Pension Fund and the 1974 Pension Fund during the term of this Agreement. These contributions, which may be adjusted from time to time, shall be made by all Employers signatory hereto during the term of this Agreement.

163

Art. XX

In addition, each signatory Employer hereby agrees to fully guarantee the health benefits provided under its own Employer Plan described in Section (c)(3)(i) of this Article XX during the term of this Agreement.

## GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS

The following is a general description of certain information contained in the UMWA 1950 Pension Plan and Trust, the UMWA 1974 Pension Plan and Trust, and the individual Employer's benefit plan. This description is intended merely to highlight certain information; it is not a complete statement of all of the provisions of the Plans and Trusts, nor is it intended to be a Summary Plan Description as defined in the Employee Retirement Income Security Act of 1974, and is qualified in its entirety by, and subject to the more detailed information contained in the Plans and Trusts, copies of which are on file and available for inspection at the offices of the UMWA Health & Retirement Funds, 2121 K Street, N.W., Washington, D.C. 20037. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

The benefits provided by the 1993 Benefit Trust may be amended from time to time, as determined by the 1993 Benefit Plan Trustees, subject to the following restrictions, and to the terms of the Trust:

164

Art. XX

(a) Benefits under the 1993 Benefit Trust shall only be those that can be provided from the assets of the Trust, but there shall be no benefit improvements during the term of this Agreement, and the total package of benefits under the Plan shall not exceed the value of the benefits provided under the individual Employer Plan pursuant to this Article.

(b) All 1950 and 1974 Pension Plan Pensioners, disabled miners not yet eligible for immediate pension benefits, and surviving spouses, who are eligible for benefits from the 1993 Plan as of January 1, 2002, will receive a $2,250 payment from their respective Pension Plans on or before April 1, 2002, and on or about January 1 of each successive year of this Agreement. All 1950 and 1974 Pension Plan Pensioners, disabled miners not yet eligible for immediate pension benefits, and surviving spouses, who are determined to be eligible for benefits from the 1993 Plan during the term of this Agreement will receive a $2,250 payment from their respective Pension Plans on or about the later of April 1, 2002, or the first day of the second month following the month in which they are determined to be eligible for benefits from the 1993 Plan, and on or about January 1 of each successive year of this Agreement. The $2,250 payment set forth in this paragraph is not intended as an ongoing feature of either the 1950 or 1974 Pension Plan, and the Plans shall have no obligation to provide payments of this type other than those expressly provided for in this Article and in the Plans.

165

Art. XX

Any 1950 or 1974 Pension Plan Pensioner, disabled miner not yet eligible for immediate pension benefits, or surviving spouse, who would otherwise be eligible for coverage from the 1993 Plan shall elect whether to have coverage under the 1993 Plan. If such individual so elects, he or she may direct that $2,000 of the $2,250 pension payment for the year be made directly to the 1993 Plan. Coverage under the 1993 Plan shall permanently cease for any family that does not elect coverage and make a payment under this paragraph once each year (either by direct payment from the 1950 or 1974 Pension Plan or otherwise) within 30 days of the date such pension payment is made. A family shall not be required to make any payment under this paragraph for any calendar year in which it has not received the $2,250 pension payment.

(c) No beneficiary shall be eligible for any benefit that is more generous than the retiree medical benefit contractually required to be provided under the individual employer benefit plan maintained by the last signatory Employer.

(d) The assets of the 1993 Benefit Trust shall be subject to semi-annual valuations in January and July of each year. Effective January 31, 2004, if any such valuation shows that the net assets available for plan benefits is equal to less than $2 million ($2,000,000), the Trustees must, within 90 days, reduce Plan benefits to the extent necessary to assure that the Trust continues to be solvent and able to provide benefits.

166

Art. XX

For purposes of this paragraph, "net assets available for plan benefits" is the amount shown as such on the 1993 Benefit Plan monthly financial statements, under "Statements of Net Assets Available for Plan Benefits." In the event that any valuation shows that the net assets available for plan benefits is equal to or less than $2 million ($2,000,000), and the Trustees do not act within 90 days to reduce Plan benefits as required, then the Executive Director of the UMWA Health & Retirement Funds (or if such position is vacant, the highest ranking staff member working exclusively on health benefit plan matters) shall adopt such benefit reductions effective immediately.

The parties expressly agree that the language references to "for life" and "until death" that are retained in this General Description are intended to mean that each Employer will provide, for life, only the benefits of its own eligible retirees who retire during the term of this Agreement. A retiree shall be considered to be a retiree of an Employer if his last signatory classified employment was with such Employer. The benefits and benefit levels provided by an Employer under its Employer Plan are established for the term of this Agreement only, and may be jointly amended or modified in any manner at any time after the expiration or termination of this Agreement.

However, under no circumstances will an Employer be responsible to provide benefits or to contribute toward the provision of benefits, through the

167

Art. XX

1993 Benefit Trust or any other plan, trust or mecha-
nism, to former employees and retirees (or their
spouses, surviving spouses or dependents) of any
other Employer beyond the term of this Agreement.

The following general description does not apply
to plans maintained pursuant to the Coal Act.

## (1) PENSIONS FOR MINERS RETIRED UNDER THE 1950 PENSION PLAN:

Beginning on the Effective Date, pension benefits
are according to the following schedules:

(a) For pensioners with at least 20 years of credited
service who retired on other than a disability pension,
the pension is $405 per month. Any such pensioner
whose pension is in pay status as of October 31, 2002
shall be issued by November 1, 2002, by separate
check from the 1950 Pension Plan, a one-time single
sum payment of $550. Any such pensioner whose
pension is in pay status as of October 31, 2003 shall
be issued by November 1, 2003, by separate check
from the 1950 Pension Plan, a one-time single sum
payment of $550. Any such pensioner whose pension
is in pay status as of October 31, 2004 shall be issued
by November 1, 2004, by separate check from the
1950 Pension Plan, a one-time single sum payment of
$550. Any such pensioner whose pension is in pay
status as of October 31, 2005 shall be issued by No-
vember 1, 2005, by separate check from the 1950
Pension Plan, a one-time single sum payment of $565.

Art. XX

Any pensioner who is receiving a disability pension or a pension with at least twenty years of credited service under this Plan is entitled to receive health benefits until death except during any month in which he is regularly employed at an earnings rate equivalent to at least $1,800 per month, increased to $2,000 per month on January 1, 2005. A widow is entitled to receive health benefits until her death or remarriage subject to the same $1,800 ($2,000 on January 1, 2005) earnings limit.

(c) For all other pensioners and future pensioners, the benefit is increased by $15 per month. Any such pensioner whose pension is in pay status as of October 31, 2002 shall be issued by November 1, 2002, by separate check from the 1950 Pension Plan, a one-time single sum payment of $425. Any such pensioner whose pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1950 Pension Plan, a one-time single sum payment of $425. Any such pensioner whose pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1950 Pension Plan, a one-time single sum payment of $425. Any such pensioner whose pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any such pensioner whose pension is in pay status as of October

170

Art. XX

31, 2006 shall be issued by November 1, 2006, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440.

## (1A) 1950 WIDOWS' PENSION:

A Widow's Pension is provided through the 1950 Pension Plan to widows of miners who were receiving a 1950 pension at the time of their death. The benefit is $155 per month. Existing as well as future widows of 1950 Pensioners will receive this benefit.

Any widow whose 1950 pension is in pay status as of October 31, 2002 shall be issued by November 1, 2002, by separate check from the 1950 Pension Plan, a one-time single sum payment of $425. Any widow whose 1950 pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1950 Pension Plan, a one-time single sum payment of $425. Any widow whose 1950 pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1950 Pension Plan, a one-time single sum payment of $425. Any widow whose 1950 pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any widow whose 1950 pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440.

Art. XX

## (2) PENSIONS FOR MINERS WHO RETIRED UNDER THE 1974 PENSION PLAN PRIOR TO THE EFFECTIVE DATE:

Pension benefits for pensioners who retired prior to the Effective Date are according to the following schedules:

(a) For pensioners who retired on other than a minimum disability pension, the pension is increased by $15 per month. Such pensioner will be entitled to retain his Health Services card for life, subject to the $1,800 ($2,000 on January 1, 2005) earnings limit. Upon his death, his widow will retain a Health Services card until her death or remarriage, subject to the $1,800 ($2,000 on January 1, 2005) earnings limit.

(b) For pensioners who retired on a minimum disability pension, the pension is $230 per month. Such pensioner will be entitled to retain his Health Services card for life. Upon his death, his widow will retain a Health Services card until her death or remarriage, subject to the $1,800 ($2,000 on January 1, 2005) earnings limit.

(c) Any pensioner who retired on other than a disability pension and whose pension is in pay status as of the Effective Date shall receive an increase in his pension of $15 per month. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2002 shall be issued by November 1, 2002, by separate check from the 1974 Pension Plan, a one-time single sum payment of

172

Art. XX

$550. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565.

Any pensioner whose disability pension is in pay status as of the Effective Date shall receive an increase in his disability pension of $15 per month. Any pensioner whose disability pension is in pay status as of October 31, 2002 shall be issued by November 1, 2002, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any pensioner whose disability pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan,

173

Art. XX

a one-time single sum payment of $425. Any pensioner whose disability pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any pensioner whose disability pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any pensioner whose disability pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

(d) For surviving spouses of 1974 pensioners, the benefit is increased by $15 per month. A surviving spouse whose survivor pension is in pay status as of October 31, 2002 shall be issued by November 1, 2002, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. A surviving spouse whose survivor pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. A surviving spouse whose survivor pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. A surviving spouse whose survivor pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from

174

the 1974 Pension Plan, a one-time single sum payment of $440. A surviving spouse whose survivor pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Such surviving spouse will retain a Health Services card until her death or remarriage, subject to the $1,800 ($2,000 on January 1, 2005) earnings limit.

### (3) PENSIONS FOR MINERS WHO RETIRE ON OR AFTER THE EFFECTIVE DATE:

A working miner who retires on or after the Effective Date and who is eligible for a pension under the terms of this Agreement will receive pension benefits based upon the 1974 Pension Plan. Subject to (4) below, full credit is provided for years worked as a classified Employee in mines of signatory Employers.

The earliest retirement age is 55. A miner may retire at 55 with 10 or more years of signatory service.

Pension benefits are increased as a miner accumulates years of signatory service. Benefits are also increased based upon a miner's age at the time of retirement with maximum benefits payable to miners who retire at the age of 62 or more.

In order to calculate the amount of a retirement benefit, it is necessary to add:

(1) the benefit amount for signatory service earned prior to February 1, 1989 ("Pre-1989 signatory service");

175

Art. XX

(2) the amount for signatory service earned between February 1, 1989, and January 31, 1990 ("1989 signatory service");

(3) the amount for signatory service earned on or after February 1, 1990 and before December 16, 1993 ("Post-1989 signatory service"); and

(4) the amount for signatory service earned on or after December 16, 1993 ("Post-1993 signatory service").

The retirement benefit for signatory service earned prior to February 1, 1989, is the following:

$38.50 per month multiplied by the years of Pre-1989 signatory service for the first 10 such years, plus

$39.00 per month multiplied by the years of Pre-1989 signatory service for the second 10 such years, plus

$39.50 per month multiplied by the years of Pre-1989 signatory service for the third 10 such years, plus

$40.00 per month multiplied by the years of Pre-1989 signatory service for each such year over 30.

The retirement benefit for signatory service earned from February 1, 1989, to January 31, 1990, is $46.00 for a year of 1989 signatory service.

The retirement benefit for signatory service earned from February 1, 1990, to December 16, 1993, is $50.50 per year of Post-1989 signatory service.

The retirement benefit for signatory service earned on or after December 16, 1993 is $53.50 per year of Post-1993 signatory service.

Art. XX

For a working miner who retires on or after January 1, 2004, and who is eligible for a pension under the terms of this Agreement, each dollar amount specified above is increased by $2.00. For a working miner who retires on or after January 1, 2006, and who is eligible for a pension under the term of this Agreement, each dollar amount specified above is increased by an additional $4.00.

To estimate your pension, use the tables on pages 303-309.

Any pensioner whose pension (other than a disability pension) is in pay status as of the Effective Date shall receive an increase in his pension of $15 per month. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2002 shall be issued by November 1, 2002, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2005 shall be issued by No-

177

Art.XX

vember 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565.

## (4) SIGNATORY SERVICE:

Effective as of the calendar year 1978, each miner who works at least 1,000 hours in a calendar year as a classified Employee with a signatory Employer will receive credit for a full year of signatory service for the purpose of determining the amount of the pension. Time spent performing contractual obligations (such as safety inspections, mine committee work, etc.) shall be considered as hours worked in the schedule below. Time spent performing work for the UMWA, its districts and local unions in lieu of regular scheduled classified work for the Employer shall be considered as hours worked in the schedule below. A person who is eligible to receive sickness and accident benefits will receive credit as hours worked in the schedule below, for the period of eligibility. Each miner who works less than 1,000 hours in a calendar year as a classified Employee with a signatory Employer will receive credit for the above purpose for a percentage of a year calculated in accordance with the following schedule:

178

Art. XX

| Hours Worked | Percentage of a Year of Signatory Service |
|---|---|
| less than 250 | 0 |
| 250-499 | 25% |
| 500-749 | 50% |
| 750-999 | 75% |
| 1,000 or more | 100% |

For the purpose of calculating benefits and/or determining vesting, employment with the United Mine Workers of America, following classified employment with an Employer, shall be treated as signatory service, provided that the employee does not receive a pension from the United Mine Workers of America Pension Plan based on such service.

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew as provided in Appendix C shall receive credit for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

Special Rule for 1993—For the calendar year 1993, a classified Employee who participated in an authorized

179

Art. XX

strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

## (5) PENSIONS FOR DISABLED MINERS:

A miner who becomes permanently and totally disabled as a result of a mine accident occurring after the Effective Date will become eligible for pension benefits in accordance with the following schedule:

(a) If a miner has less than ten years of signatory service at the time of retirement, the miner will receive a $230 per month pension. Such pensioner will be entitled to retain a Health Services card for life. Upon his death, his widow will retain a Health Services card until her death or remarriage, subject to the $1,800 ($2,000 on January 1, 2005) earnings limit.

(b) If a miner has ten years or more of signatory service at the time of retirement, the miner will receive the greater of the minimum pension payable to a miner with less than ten years of signatory service or a pension based upon the years of signatory service which the miner has accumulated at the time of retirement calculated in accordance with the benefit schedule in (3) above. Such pensioner will be entitled to retain a Health Services card for life. Upon his death, his widow will retain a Health Services card until her death or remarriage, subject to the $1,800 ($2,000 on January 1, 2005) earnings limit.

180

Art. XX

(c) Any miner whose disability pension under this section is in pay status as of the Effective Date shall receive an increase in his disability pension of $15 per month. Any pensioner whose disability pension under this section is in pay status as of October 31, 2002 shall be issued by November 1, 2002, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any pensioner whose disability pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any pensioner whose disability pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any pensioner whose disability pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any pensioner whose disability pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

**(6) PENSIONS FOR SURVIVING SPOUSES:**

The 1974 Pension Plan provides for Surviving Spouse pensions. Benefits for an eligible surviving spouse will be payable in accordance with the following:

181

Art. XX

(a) If, on or after the Effective Date, a working miner dies (regardless of cause) and would have been eligible for an immediate pension had the miner retired on the date of death, the surviving spouse will be eligible for a pension equal to 75% of the pension the miner would have received, and will receive this pension until death. Such surviving spouse will be entitled to retain a Health Services card until death or remarriage, subject to the $1,800 ($2,000 on January 1, 2005) earnings limit.

(b) Upon the death of a pensioner, other than a deferred vested pensioner with less than 20 years of service, the surviving spouse of such pensioner will receive a pension equal to 75% of the pensioner's pension until death. Such surviving spouse will be entitled to retain a Health Services card until death or remarriage, subject to the $1,800 ($2,000 on January 1, 2005) earnings limit.

(c) If a miner working on or after the Effective Date becomes eligible for a pension, other than a deferred vested pension with less than 20 years of service, at any time thereafter, upon his death after age 55, the surviving spouse will be entitled to receive a Surviving Spouse pension equal to 75% of the miner's pension until death. Such surviving spouse will be entitled to retain a Health Services card until death or remarriage, subject to the $1,800 ($2,000 on January 1, 2005) earnings limit.

(d) If a miner had completed 10 years of credited service, died as a result of a mine accident during the

182

term of the 1978 or 1981 Wage Agreement, and was not covered by a Surviving Spouse pension (or by any other monthly benefit payable to a surviving spouse under a Wage Agreement), the surviving spouse, if she has never remarried and is surviving on the first day of the month following the Effective Date, will be entitled to receive a lump sum in the amount of $10,000, plus $100 for each month beginning with the first month following the Effective Date and continuing until her remarriage or death.

(e) Any surviving spouse whose survivor pension is in pay status as of the Effective Date shall receive an increase in her survivor pension of $15 per month. Any surviving spouse whose survivor pension is in pay status as of October 31, 2002 shall be issued by November 1, 2002, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any surviving spouse whose survivor pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any surviving spouse whose survivor pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any surviving spouse whose survivor pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

Art. XX

Any surviving spouse whose survivor pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

## (6A) PRE-RETIREMENT SURVIVOR'S PENSION:

The Plan also provides a 75% survivor's pension for the spouse of a working miner with 10 years of vested pension rights who dies before retirement age. The pension benefit will be payable to the surviving spouse at the time the miner would have attained age 55.

Any surviving spouse whose survivor's pension is in pay status as of the Effective Date shall receive an increase in her survivor's pension of $15 per month. Any surviving spouse whose survivor pension is in pay status as of October 31, 2002 shall be issued by November 1, 2002, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any surviving spouse whose survivor pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any surviving spouse whose survivor pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any surviving spouse whose survivor pension is in pay status as of October 31, 2005 shall be issued by

184

Art. XX

November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any surviving spouse whose survivor pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

## (7) DEFERRED VESTED OR SPECIAL PENSIONS:

(a) If after the Effective Date a working miner ceases working for any reason, except as provided in (b) below, after completing at least 10 years of signatory employment, and before age 55, the miner will be eligible to receive a pension at age 62, or an actuarially reduced pension at any time after 55. This pension will be calculated in accordance with (3) above.

(b) If after the Effective Date a working miner ceases working and meets the following criteria:

(i) had 20 years of signatory service on date last worked;

(ii) had attained the age of 50 on the date last worked; and either

(iii) had been laid off and had not refused a recall to the mine from which he was laid off; or

(iv) had been terminated under Article III, Section (j) of the Wage Agreement (or if the miner had not been terminated, there had been a deterioration in physical condition which prevented the miner from

185

Art. XX

performing his regular work as determined by a panel of three physicians, if the degree of such physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter; then the miner will be eligible to receive a pension at age 62, or a pension at any time after age 55, reduced by one-quarter of one percent for each full month between the date on which pension benefits begin and the date the miner attains age 62.

(c) Any miner who ceased work prior to the Effective Date, is eligible to receive a deferred vested pension under the 1974 Pension Plan and satisfies the criteria in (b) above shall have his pension recomputed using the ¼ of one percent reduction based on the formula in effect at his retirement. Such pensioner shall have his pension increased by any increases applicable to Age 55 Retirement which occurred after the date of his retirement and application for pension. Any increase under this paragraph shall be applied prospectively only.

(d) If on or after January 1, 2002, a working miner ceases performing classified work and meets the following criteria:

(i) he had 20 years of signatory service on his date last worked;

(ii) he had been laid off and had not refused a recall to the mine from which he was laid off; or

(iii) he had been terminated under Article III, Section (j) of the Wage Agreement (or if the miner had

186

Art. XX

not been terminated, there had been a deterioration in physical condition which prevented the miner from performing his regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter; and

(iv) his pension is not in pay status on or before August 16, 1996;

then the miner will be eligible to receive a pension at age 62, or a pension at any time after age 55, reduced by one-quarter of one percent for each full month between the date on which pension benefits begin and the date the miner attains age 62.

(e) Special Permanent Layoff Pension—If on or after January 1, 2002, a working miner ceases performing classified work and meets the following criteria:

(i) he had 20 years of signatory service on his date last worked and was less than age 55; and

(ii)(A) he has been permanently laid off under circumstances in which his Employer has permanently closed the mine, or

(B) he has been permanently laid off;

then the miner will be eligible to receive a pension computed under the provisions of (3) above, calculated as if he were then age 55. In the case of a layoff described in (ii)(A) above, the pension will be effective on the first day of the first month following both the layoff and the filing of a pension application. In

187

Art. XX

the case of a layoff described in (ii)(B) above, the pension will be effective on the first day of the first month following both a period of 180 days after the layoff and the filing of a pension application. A miner will be considered to have been "permanently laid off" under (ii)(B) if he has been on layoff status for at least 180 days, and has not refused a recall to the mine from which he was laid off. A miner who receives this special permanent layoff pension benefit, or any other pension benefit under this Article, forfeits all seniority, panel, and recall rights.

(f) Special 30-and-Out Layoff Pension—If a working miner meets the following criteria:

(i) his last day of credited service under the 1974 Pension Plan is on or after January 1, 2002; and

(ii) he had at least 30 years of signatory service on such last day of credited service; and

(iii) he has been laid off and has not refused a recall to the mine from which he was laid off;

(iv) if, because of a layoff, he was not actively at work as of December 31, 2001:

(I) he earned at least 250 hours of credited signatory service following his return to work, or

(II) he returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not

188

Art. XX

for the purpose of entitling the Participant to this Special 30-and-Out Layoff Pension benefit; then the miner will be eligible to receive a pension computed under the provisions of (3) above, but with no actuarial reduction on account of age.

(g) 30-and-Out Pension—If a working miner meets the following criteria:

(i) his last day of credited service under the 1974 Pension Plan is on or after January 1, 2003; and

(ii) he had at least 30 years of signatory service on such last day of credited service;

(iii) if, because of a layoff, he was not actively at work as of December 31, 2001:

(I) he earned at least 250 hours of credited signatory service following his return to work, or

(II) he returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this 30-and-Out Pension benefit;

then the miner will be eligible to receive a pension computed under the provisions of (3) above, but with no actuarial reduction on account of age.

(h) The Surviving Spouse pension described in paragraph (6) does not apply to the surviving spouse of a miner receiving a deferred vested pension with less than 20 years of service.

189

Art. XX

(i) Any such miner whose pension is in pay status as of the Effective Date shall receive an increase in his pension of $15 per month. Any such pensioner whose pension is in pay status as of October 31, 2002 shall be issued by November 1, 2002, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any such pensioner whose pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any such pensioner whose pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $550. Any such pensioner whose pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any such pensioner whose pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565.

(j) The surviving spouse of such miner whose survivor's pension is in pay status as of the Effective Date shall receive an increase in her survivor's pension of $15 per month. Any such surviving spouse whose survivor's pension is in pay status as of October 31, 2002 shall be issued by November 1, 2002, by separate check from the 1974 Pension Plan, a one-time single

190

sum payment of $425. Any such surviving spouse whose survivor's pension is in pay status as of October 31, 2003 shall be issued by November 1, 2003, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any such surviving spouse whose survivor's pension is in pay status as of October 31, 2004 shall be issued by November 1, 2004, by separate check from the 1974 Pension Plan, a one-time single sum payment of $425. Any such surviving spouse whose survivor's pension is in pay status as of October 31, 2005 shall be issued by November 1, 2005, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any such surving spouse whose survivor's pension is in pay status as of October 31, 2006 shall be issued by November 1, 2006, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

## (7A) PENSION BONUSES:

(a) The one-time single sum pension payments set forth in this Article are not intended as an ongoing feature of either the 1950 or 1974 Pension Plan, and the Plans shall have no obligation to provide payments of this type other than those expressly provided for in this Article and in the Plans.

(b) Non-Duplication—No individual shall be entitled to receive a single sum pension payment on any given date under more than one provision of this Article.

Art. XX

## (8) LIFE AND ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS:

Life and Accidental Death and Dismemberment Insurance benefits are provided by the Employer for working miners in accordance with the following schedule:

(a) Upon the death of a working miner due to other than violent, external and accidental means on or after the Effective Date, life insurance benefits in the amount of $70,000 will be paid to the miner's named beneficiary. Spouses who are not eligible for surviving spouse pension benefits, will continue eligibility for a Health Services card (also covers dependents) until remarriage or for 60 months, whichever occurs first, subject to the $1,800 ($2,000 on January 1, 2005) earnings limitation.

(b) Upon the death of a working miner due solely to violent, external and accidental means on or after the Effective Date, life insurance in the amount of $140,000 will be paid to the miner's named beneficiary. Spouses who are not eligible for surviving spouse pension benefits, will continue eligibility for a Health Services card (also covers dependents) until remarriage or for 60 months, whichever occurs first, subject to the $1,800 ($2,000 on January 1, 2005) earnings limitation.

(c) If a working miner should lose 2 or more members due to violent, external and accidental means on or after the Effective Date, the miner shall receive an

192

Art. XX

$80,000 dismemberment benefit. If a working miner shall lose one member due solely to violent, external and accidental means on or after the Effective Date, the miner shall receive a $40,000 dismemberment benefit. A member for the purpose of the above is (i) a hand at or above the wrist, (ii) a foot at or above the ankle or (iii) total loss of vision in one eye.

(d) Accidental death or dismemberment benefits are not payable if caused in whole or in part by disease, bodily or mental infirmity, ptomaine or bacterial infection, hernia, suicide, intentional self-inflicted injury, insurrection or acts of war or is caused by or results from committing or attempting to commit a felony.

## (9) PENSIONER'S DEATH BENEFITS:

(a) Upon the death on or after the Effective Date of a pensioner who has retired under the 1950 Pension Plan, and who is not a participant in the Combined Benefit Fund, a $7,000 death benefit will be paid by the 1950 Pension Plan to his widow, or, in the absence of a widow to his dependents, if any; otherwise a $6,000 death benefit will be paid by the 1950 Pension Plan to his nearest survivor.

(b) Upon the death on or after the Effective Date of a pensioner under this Agreement who retired under the 1974 Pension Plan, with other than a deferred vested pension based on less than 20 years of credited service, a $7,000 death benefit will be paid by

193

Art.XX

the 1974 Pension Plan to the named beneficiary of
the deceased retiree if such named beneficiary is a
surviving spouse or dependent relative; otherwise, a
death benefit of $6,000 will be paid by the 1974 Pen-
sion Plan to the named beneficiary of such deceased
retiree. For purposes of this paragraph, "a pensioner
under this Agreement" means a pensioner who is not
entitled to benefits from the Combined Fund, is not
entitled to death benefit coverage from a plan main-
tained by his employer, and who meets one of the fol-
lowing conditions:

    i)   the pensioner is a participant in the
        1992 Benefit Plan;

   ii)   the pensioner is a participant in the
        1993 Benefit Trust;

  iii)   the pensioner is a participant in an indi-
        vidual employer plan maintained pur-
        suant to the Coal Act and whose last
        signatory employer ceased producing
        and/or processing coal prior to Decem-
        ber 16, 1993;

  iv)   the pensioner was entitled to death ben-
        efit coverage from the 1974 Pension
        Plan on February 1, 1993 (or would
        have been had he been retired or eligi-
        ble to retire on that date); or

   v)   the pensioner's last signatory employer
        (the employer for whom such pensioner
        last worked in signatory classified em-

194

ployment) is a current 1974 Pension Plan contributor signatory to the 2002 NBCWA or to an agreement (including prior agreements, where applicable) requiring a contribution obligation with respect to the 1974 Pension Plan that is identical to the contribution obligation set forth in the 2002 NBCWA (or prior NBCWAs, where applicable).

## (10) HEALTH CARE:

Health care benefits provided under the Employer Benefit Plan are guaranteed during the term of this Agreement subject to the terms of this Agreement at the level of benefits provided in the Employer Benefit Plan.

(a) Working miners will be provided health benefits through their individual Employer's Benefit Plan maintained pursuant to this Article.

(b) Pensioners, other than deferred vested pensioners with less than 20 years of service, pensioners receiving a Special Permanent Layoff Pension, pensioners receiving a Special 30-and-Out Layoff Pension, and pensioners receiving a 30-and-Out Pension, retired under the 1974 Pension Plan will be provided health benefits through the Employer from which they retired. Pensioners entitled to benefits from a plan maintained pursuant to the Coal Act will receive benefits from such plan.

(c) Pensioners receiving a Special Permanent Layoff Pension or a Special 30-and-Out Layoff Pension

Art. XX

will be provided health benefits from their Employers in accordance with the layoff benefits otherwise provided under this Wage Agreement; subsequently, upon reaching age 55, such pensioners shall receive health benefits from their Employers. Pensioners receiving a 30-and-Out Pension will, upon reaching age 55, receive health benefits from their Employers.

(d) Pensioners, both regular and disabled, their surviving spouses and dependents, who are described in Section (c)(3)(ii) will have benefits provided under the 1993 Benefit Plan and Trust.

(e) Pregnancy benefits will be provided in the same manner as for any other disability.

(f) Only benefits for prescription drugs (only those drugs requiring a prescription for dispensing) are provided.

(g) Spouses of working miners who died, who are not eligible for Surviving Spouse pension benefits, will continue eligibility for health care until remarriage, or for 60 months, whichever occurs first, subject to the $1,800 ($2,000 on January 1, 2005) earnings limit.

(h) Deferred vested pensioners with less than 20 years of service under the 1974 Pension Plan and miners who will receive a pension with less than 20 years of service under the 1950 Pension Plan are ineligible for health care. Disability pensioners under both the 1950 and 1974 Pension Plans will continue to receive their Health Services card.

196

(i) Disabled or retarded children of Health Services cardholders will be covered for life, so long as a surviving parent holds the card.

## Explanatory Note on Employer Provided Health Plans

Active miners and their surviving spouses and dependents, and pensioners, their dependents, and surviving spouses receiving pensions from the 1974 Pension Plan, will receive health care provided by their Employer through insurance carriers. A Health Services card identifying the Participant's eligibility for benefits under the health plan shall be provided by the Employer.

The Trustees of the UMWA Health and Retirement Funds shall resolve any disputes, as provided in Section (e)(5), including excessive fee disputes, to assure consistent application of the health plan provisions in the Employer Benefit Plans and of the managed care programs authorized by this Agreement.

## Enhanced Cost Containment Program

In an effort to address the problems generated by the ever-increasing cost of health care, while maintaining a high level of benefits, the parties have mutually agreed to adopt managed care and cost containment programs.

a. Coordination of Benefits

If an individual is covered as a dependent under both the Employer Benefit Plan and under a plan

197

Art. XX

maintained by a different employer, the benefits of the two plans will be coordinated so that no more than the total charges for covered medical goods and services will be paid. In no event will the Employer Benefit Plan be required to pay more than it otherwise would have paid without regard to this provision. The health plan shall coordinate benefits in accordance with the "birthday rule" adopted by the National Association of Insurance Commissioners.

b. Generic Drug Substitution

If a Beneficiary uses a brand name drug when a generic equivalent is available, the Beneficiary is responsible for the difference in cost between the generic drug and the brand name drug, in addition to the normal copayment. A generic drug will not be considered "available" unless it has been approved by the federal Food and Drug Administration. In addition, if the prescribing physician determines that use of a brand name drug is medically necessary, the generic drug will not be considered "available," and there will be no additional payment by the beneficiary for the use of the brand name drug.

c. Health Care Payment/Deductible

On January 1 of each year during the term of this Agreement (or such later date an individual first becomes an eligible Participant), each eligible participant will receive a lump sum health care payment of $1,000.

198

Art. XX

For purposes of this provision, "eligible participants" means active Employees, laid-off Employees, and disabled Employees prior to eligibility for Medicare benefits, who are participants in the Employer Plan maintained pursuant to this Article. Notwithstanding the foregoing, a laid-off Employee shall receive a pro-rata health care payment that reflects the number of calendar quarters during which he is entitled to Employer-provided health care under the plan during the calendar year. A health care payment shall not be paid to any individual who is not then entitled to Employer-provided benefits under the Employer Plan.

During the term of this Agreement, 1974 Pension Plan Pensioners who are not eligible for unreduced Social Security benefits, and surviving spouses who are not eligible for unreduced Social Security benefits, whose last signatory employer is signatory to this Agreement (or to an Agreement with identical employee benefit obligations) will receive the $1,000 payment described in the preceding paragraph from the 1974 Pension Plan. Each pensioner and surviving spouse shall receive a pro-rata payment for the calendar year in which he or she will attain eligibility for Medicare that reflects the number of calendar quarters during such year prior to the month in which he or she attains such eligibility. Notwithstanding the foregoing, no payment shall be made to any individual who is not then entitled to Employer-provided benefits under the Employer Plan or to any disabled individual eligible for Medicare benefits.

199

Art. XX

All health benefits provided under the Employer Plan will be subject to a $750 deductible per family per calendar year. The first $750 of all covered medical expenses incurred by any covered family member will be counted toward satisfying the deductible. Vision care and prescription drug expenses are not subject to the deductible. The deductible requirement only applies to benefits provided to covered active, laid-off, disabled and retired employees (and spouses, surviving spouses and dependents) under the Employer Plans maintained pursuant to this Article. Notwithstanding the foregoing: (i) the deductible for a laid-off employee for a calendar year shall be the pro-rata portion of $750 that reflects the number of calendar quarters during which he is entitled to Employer-provided health care under the plan during such year; (ii) the deductible for a pensioner or a surviving spouse for the calendar year in which he or she will attain eligibility for unreduced Social Security benefits shall be the pro-rata portion of $750 that reflects the number of calendar quarters during such year prior to the month in which he or she attains such eligibility; (iii) the deductible for a disabled employee, or a disabled pensioner under age 65, will cease to be in effect beginning with the first calendar year following his or her eligibility for Medicare benefits; and (iv) a newly-hired Employee, an Employee recalled from layoff, or any other individual subject to a health care payment and deductible who com-

200

mences coverage after January 1 of a year, shall receive a pro-rata health care payment, and be subject to an annual deductible, that reflects the number of calendar quarters remaining in the year. A family shall not be required to pay a deductible in any calendar year that exceeds 75 percent of the amount of the Health Care payment paid for that year.

### d. Health Care Participating Provider Lists (PPL)

The Employer may implement Participating Provider Lists (PPLs) of physicians, hospitals, pharmacies and other providers, subject to the following requirements.

1. Initial Certification and Recertification—All Participating Provider Lists (PPLs) must be certified prior to their implementation to ensure that they meet the required standards, and recertified at least once during the term of this Agreement, in accordance with a procedure to be agreed-to between the UMWA and the BCOA. The costs of certification and recertification will be borne by the Employer.

2. Ongoing Review—Continued compliance of each PPL with the required standards will be subject to ongoing review.

3. Criteria—A PPL established by an Employer must meet the necessary criteria. The following is a general statement of the required elements:

201

Art. XX

4. Choice—Each covered individual will have the freedom to select any provider within the PPL, regardless of whether that provider is a generalist or specialist.

5. Reduction of Paperwork and Prohibition on Prepayment—Eligible individuals utilizing PPL providers shall, to the extent possible, not be required to fill out or submit claims forms. In addition, such individuals shall not be required to pay a PPL provider any amount other than the copayment and any outstanding annual deductible permitted under this Agreement.

6. Quality Certification—All providers must meet quality standards.

7. Accessibility

   a. Providers will be available within a reasonable distance. Where possible, this means that a covered individual will not have to travel more than 20 to 30 minutes to receive general medical care.

   b. There will be adequate numbers of providers in the different specialties to ensure that each member will have a sufficient choice.

   c. Providers must be available to see covered individuals within a reasonable period, depending upon the nature of the problem.

202

Art. XX

8. Breadth of Scope—The PPL shall include adequate diversification of specialties and facilities.

9. Additional Specialties—The program must have provision for going outside the PPL for necessary specialties and/or facilities that are not contained within the PPL, at no additional cost to the covered individual.

10. Other Outside Referrals—The program must have provision for referral outside the PPL where particular medical services can be better provided elsewhere in the opinion of the referring PPL provider, at no additional cost to the covered individual.

11. Emergencies—Emergency treatment is covered in full (subject to applicable deductibles and copayments) whether or not provided within the PPL.

12. Beneficiaries Outside PPL Area—A Beneficiary who lives outside an area served by the PPL shall be permitted to utilize non-PPL providers without incurring additional deductibles and copayments. For purposes of determining the Beneficiary's deductibles and copayments, utilization of such non-PPL providers shall be considered to be within the PPL.

13. Transition—Out of PPL—If a Beneficiary has begun to undergo a course of treatment

203

Art. XX

with a non-PPL provider prior to the establishment of the PPL (or with a PPL provider that leaves the PPL), completion of that course of treatment will not be considered "out of PPL" as follows:

    a.  for an acute condition (including pregnancy, treatment for cancer, etc.), for the duration of the specific course of treatment.

    b.  for a chronic condition, for up to six months.

14.  Viability—A PPL must be viable, both financially and otherwise, in order to ensure that it will continue to be able to appropriately serve the participant population.

15.  Internal Review—Each PPL must have internal mechanisms (including physician peer review) to resolve member complaints and to ensure that the highest quality standards are maintained.

16.  Precertification—Precertification for services (including hospitalization) performed by PPL providers are the responsibility of the provider, and not the covered individual. In addition, precertification in the event a covered individual is referred to a provider outside the PPL is the responsibility of the PPL provider making the referral.

Failure to precertify a non-emergency hospital admission to a non-PPL hospital (other

Art. XX

than by referral from a PPL provider) or certain other specified inpatient and out-patient procedures performed by a non-PPL provider, will subject the Beneficiary to an additional $300 deductible.

17. Out of PPL Costs

a. Hospitalization—Benefits for inpatient treatment by a non-PPL hospital are paid at 90% of the in-PPL rates following exhaustion of the annual deductible. The Beneficiary is responsible for the remainder of the charges.

b. Doctor Visits—Each office visit to a non-PPL physician is subject to a $20 copayment.

c. The maximum total out-of-pocket expense under a and b above is $1,600 per family per year in addition to the annual deductible and the precertification penalties.

18. Prescription Drugs—Prescription drugs will be provided through the PPL at a reduced co-payment of $5.00. Prescriptions bought out of PPL are subject to a $10.00 co-payment. Mail order prescription drugs, where available, will be provided at no co-payment. (See chart below.)

e. Each Employer agrees to provide the Union with information sufficient to evaluate the effectiveness of

Art. XX

the cost containment programs adopted pursuant to this Article. Such information will be provided no less than annually, and shall include a detailed statement of utilization and costs associated with the Employer Benefit Plans.

After satisfying the annual deductible, the following co-payments are required under the Employer Benefit Plan:

|  | In PPL | Out of PPL |
|---|---|---|
| Prescription Drugs | $5.00 per prescription | $10.00 per prescription |
| Prescription Drugs—Mail Order (where available) | $0 per prescription | Not Applicable |
| Prescription Drugs—Brand Name Where Generic is Available | $5.00 Plus Additional Cost of Brand Name Drug | $10.00 Plus Additional Cost of Brand Name Drug |
| Physician Charges | $12.00 per office visit | $20.00 per office visit |
| Hospital— and Related Charges | $0 | Balance over 90% of PPL Charges |

In addition to the annual deductible:

206

Art. XX

a. No family will have to pay more than $240 for in-PPL physician office visits in any year.

b. No family will have to pay more than $1,600 in combined out of PPL hospital and related charges and out of PPL physician office visits.

For out of PPL services, and for services provided prior to the establishment of PPLs, claim forms will be available at most hospitals, clinics, and physician offices. Generally, nothing more is required than signing the forms authorizing the hospital, clinic, or physician to bill the insurance carrier for the services rendered. The insurance carrier will keep individual records for each Participant and dependent and will notify the Participant of the co-payments credited to his account. The hospital, clinic, or physician will bill the Participant for the co-payment amount until the maximum is reached. In some instances, when the Employee pays for services or drugs, the bills should be obtained and submitted with the claim form according to the instructions on the form. If the annual co-payment maximum has been reached, the carrier will remit to the Participant the full payment for covered benefits.

Where possible, for in-PPL services, no claim forms will be required. The PPL provider will generally be responsible for the submission of claims and other paperwork to the insurance carrier. However, Beneficiary may be required to submit claim forms and bills paid to verify that the annual deductible has been satisfied. Although a PPL provider may require

207

Art. XX

payment by the Beneficiary of permitted co-payments and deductibles, such a provider may not require payment by a Beneficiary of amounts that exceed the permitted co-payments and deductibles.

Covered drug prescriptions may be filled at drugstores, clinics and hospital prescription offices.

Each Participant will receive a "Summary Plan Description" booklet. Each year a financial report of the Plan will be provided to each Participant.

## (11) VISION CARE:

Vision care is provided for Employees, disabled Employees, Pensioners, surviving spouses, and their dependents, covered with a Health Services card through the Employer Benefit Plan. Coverage under the plan is identical to that provided in the 1998 Agreement, increased by 10% effective January 1, 2002, and by 10% effective January 1, 2005.

## (12) HEALTH CARE COST CONTAINMENT:

The Union and the Employers recognize that rapidly escalating health care costs, including the costs of medically unnecessary services and inappropriate treatment, have a detrimental impact on the health benefit program. The Union and the Employers agree that a solution to this mutual problem requires the cooperation of both parties, at all levels, to control costs and to work with the health care com-

208

Art. XX

munity to provide quality health care at reasonable costs. The Union and the Employers are, therefore, committed to fully support appropriate programs designed to accomplish this objective. This statement of purpose in no way implies a reduction of benefits or additional costs for covered services provided miners, pensioners and their families.

In any case in which a provider attempts to collect excessive charges or charges for services not medically necessary, as defined in the Plan, from a Beneficiary, the Plan Administrator or its agent shall, with the written consent of the Beneficiary, attempt to resolve the matter, either by negotiating a resolution or defending any legal action commenced by the provider. Whether the Plan Administrator or its agent negotiates a resolution of a matter or defends a legal action on a Beneficiary's behalf, the Beneficiary shall not be responsible for any legal fees, settlements, judgments or other expenses in connection with the case, but may be liable for any services of the provider which are not provided under the Plan. The Plan Administrator or its agent shall have sole control over the conduct of the defense, including the determination of whether the claim should be settled or an adverse determination should be appealed. The protections of this paragraph shall not apply until the deductible is met in full for the year, and shall not apply in the case of any service or supply obtained from a non-PPL source, until the out-of-pocket maximum is reached.

209

Art. XXB

### Orthodontic Benefits

*Orthodontic services and materials are covered for their reasonable and customary cost up to $605 ($665.50 effective January 1, 2005) per year per eligible Dependent prior to attaining age 21, with a lifetime maximum of $1,815 ($1,996.50 effective January 1, 2005) for each such Dependent.

## Article XXB—UMWA CASH DEFERRED SAVINGS PLAN OF 1988

*Section (a)* **General Purpose**

This Article provides for the maintenance of a pension plan and trust for Employees covered by this Agreement, separate and apart from those maintained pursuant to Article XX of this Agreement known as the United Mine Workers of America Cash Deferred Savings Plan of 1988. This Savings Plan shall provide additional retirement income to Employees and their dependents, and shall be funded by voluntary wage deferrals and, as necessary, Employer contributions to pay the cost of administration.

*Section (b)* **Trust**

The Savings Plan shall be maintained through an irrevocable trust, created pursuant to Section 302(c) of the Labor Management Relations Act of 1947, and qualified under Section 501(a) of the Internal Revenue Code of 1986 ("IRC"), or any successor statute.

246

Art. XXB

### *Section (c)* **Plan**

The Savings Plan shall be maintained in accordance with the requirements of Section 401(k) of the IRC, and is intended to be qualified under Section 401(a) of the IRC.

### *Section (d)* **Funding**

1. Each Employee covered by this Agreement shall be permitted to elect to have the Employer pay any portion of his or her wages to the Trustees of the Savings Plan, except that the percentage of wages so deferred may not exceed 25%, or any smaller amount imposed as a maximum limitation under the IRC.

In addition, above and beyond any other limitations, each Employee who is at least age 50 during any Plan year may contribute additional amounts during that and any subsequent Plan year as follows:

| Year | Additional Limit |
|------|------------------|
| 2002 | $1,000 |
| 2003 | $2,000 |
| 2004 | $3,000 |
| 2005 | $4,000 |
| 2006 | $5,000 |

2. Each Employee shall have the opportunity to change the percentage of wages so deferred four times per year, subject to reasonable rules and regulations adopted by the Trustees.

3. All deferred amounts shall be paid to and held

247

Art. XXB

by the Trustees of the Savings Plan, who shall maintain separate accounts for each such Employee.

## Section (e) Administration

The Savings Plan and Trust shall be jointly administered by a Board of four Trustees, two of whom shall be appointed by the UMWA and two of whom shall be appointed by the BCOA. The Trustees shall be responsible for all action necessary for the proper and efficient operation of the Plan. In the absence of any other specific direction in the Trust document, the Trustees shall, to the extent practicable, contract for administrative and investment services with independent entities in the business of and experienced in the administration and/or investment of 401(k) plans.

1. The Trustees shall have the same powers, duties, and responsibilities with respect to the Savings Plan and Trust as are set forth in Article XX of this Agreement, and the powers, duties, and responsibilities set forth in the Savings Trust documents, and this Article.

2. The Employers and the Union shall have the powers, duties, and responsibilities with respect to the Savings Plan and Trust set forth in Article XX, Sections (d)(2)-(8) and (10) and Sections (e)-(g), the Savings Trust document, and this Article.

3. Administrative costs incurred after the Effective Date will be borne by the Employers, subject to the Memorandum of Understanding entered into by the UMWA and BCOA regarding administrative costs, a

248

Art. XXB

copy of which is incorporated by reference and made a part of this Agreement. In order to implement this provision, BCOA may set an hourly rate for contributions to be made to the Savings Plan for any period during the term of this Agreement. These contributions, which shall be made on hours worked and which may be adjusted from time to time, shall be made by all Employers signatory hereto during the term of this Agreement. For purposes of this provision, the term "administrative costs" shall not include costs attributable to or in any way related to any period prior to the Effective Date of this Agreement, and in particular, shall not include any obligations incurred prior to the date or relating to costs incurred prior to that date.

4. Payments required under this Article shall be made on the 10th day of the month following the month for which the payment is owed. Payments shall be delivered or mailed to the place designated by the Trustees of the Fund.

5. It shall be the duty of each of the Employers signatory hereto to keep current said payments due to the Plan and to furnish to the International Union, United Mine Workers of America, and to the Trustees of the Plan, a monthly statement showing on a mine-by-mine basis, the full amounts due hereunder, the hours worked with respect to which any amounts are payable, and any other information, requested by the Trustees, relating to deferred wages to be paid to the Plan.

249

Art. XXB

6. Failure of any Employer signatory hereto to make full and prompt payments to the Plan in the manner and on the dates herein provided shall be deemed a violation of the Agreement. This obligation of each Employer signatory hereto, which is several and not joint, to so pay such sums shall be a direct and continuing obligation of said Employer, and it shall be deemed a violation of this Agreement if any mine, preparation plant or other facility to which this Agreement is applicable shall be sold, leased, sub-leased, assigned or otherwise disposed of for the purpose of avoiding any of the obligations hereunder.

7. Each Employer agrees to give proper notice to the President of the appropriate local union by the 18th day of each month that the Employer has made the required payment to the Plan for the previous month, as required by this Article, or is delinquent in such payment, such notice to set forth the amount paid to the Plan, or the amount of delinquency and, where pertinent, the hours worked with respect to the mine or mines under the jurisdiction of such local union.

## Section (f) **Investments**

Each participant shall have the opportunity to select an investment vehicle for his or her individual account balance, or may apportion his or her account balance among two or more such investment vehicles, subject to reasonable rules and regulations adopted by the Trustees.

Art. XXB

1. The investment vehicles among which Employees may choose shall contain a broad range of investment alternatives. In addition to any investment vehicles selected by the Trustees, the range of investments offered to Employees shall include at least two vehicles selected by the Trustees from a list prepared by the UMWA and two vehicles selected by the Trustees from a list prepared by the BCOA. In lieu of presenting a list of investment vehicles, the UMWA and/or the BCOA may specify criteria by which the Trustees shall select the two designated investment vehicles.

2. Participants shall have the opportunity to elect alternative investment vehicles no more than four times per year, in accordance with reasonable rules and regulations adopted by the Trustees.

## Section (g) Plan and Trust Provisions

The Trust and Plan are incorporated by reference and considered a part hereto. In the event that any provision of this Article or of any Plan or Trust created pursuant hereto shall violate applicable law, then the parties hereto shall meet to engage in good faith negotiations to agree upon a means of correcting such illegality, so as to effect the intent hereof; except that the Trustees may adopt any amendments necessary to conform the Plan or Trust to the requirements of ERISA, or any other applicable federal law, and the regulations issued thereunder.

251

Art. XXIX

sixty days notice of termination of this Agreement and, thereafter shall meet and discuss and attempt to agree on the basis for a continuation of the Agreement for its term. If no agreement is reached within the 60-day period, the Agreement will terminate.

## Article XXIX—RATIFICATION AND TERMINATION OF THIS AGREEMENT

This Agreement shall become effective at 12:01 a.m. on January 1, 2002 (the Effective Date), provided that this Agreement has been ratified and approved by the membership covered hereby.

Except as provided in Article XXVIII, Section (b) (Severability Clause), this Agreement shall not be subject to termination by either party signatory hereto prior to 11:59 p.m., December 31, 2006, provided, however, that either the parties of the first part or the party of the second part may terminate this Agreement on or after 11:59 p.m., December 31, 2006, by giving at least sixty days written notice to the other party of such desired termination date.

In the event of an economic strike at the expiration of this Agreement, Employers will advance the premiums for the Employees' health and life insurance coverage for the first 30 days of such strike. Such advanced premiums shall be repaid to the Employers by the Employees through check-off deduction upon their return to work. Should such a strike continue beyond 30 days, the Union or the Employees may

285

Art. XXIX

elect to continue coverage by paying the premiums themselves. This paragraph shall survive the termination of the remainder of this Agreement and shall continue in effect until the purpose for which it was established is satisfied.

IN WITNESS WHEREOF, each of the parties signatory hereto has caused this Agreement to be signed this first day of January, 2002, to become effective only upon the condition that it is ratified and approved by the membership covered hereby.

UNITED MINE WORKERS OF AMERICA
    CECIL E. ROBERTS
    International President
    JERRY D. JONES
    International Vice President
    CARLO TARLEY
    International Secretary-Treasurer

BITUMINOUS COAL OPERATORS' ASSOCIATION, INC.
    DAVID M. YOUNG
    President

    DATE
    January 1, 2002

286